(No. 46844

BROWNFIELD SUBDIVISION, INC., *et al.*, Appellees, v. REX McKEE *et al.*, Appellants.

*Opinion filed May 19, 1975.—Rehearing denied September 24, 1975.*

Bock & Stenger, of Belleville (Ralph T. Stenger, of counsel), for appellants.

Dobbins, Fraker & Tennant, of Champaign (Donald M. Tennant and Richard M. Joy, of counsel), for appellees.

MR. JUSTICE WARD delivered the opinion of the court:

Acting on the complaint of Brownfield Subdivision, Inc., a not-for-profit corporation, and E. J. Buras, the plaintiffs, the circuit court of Champaign County entered an order of injunction prohibiting the defendants, Robert and Mary Ann Collenberger, from occupying what was described as a sectional home in the Brownfield subdivision as a residence. The ground for the order was the court's finding that the structure was a mobile home, a type of structure prohibited in the subdivision by an applicable restrictive covenant. The appellate court affirmed (19 Ill. App. 3d 374), and we granted a petition for leave to appeal filed by the defendants.

The restrictive covenant provides in part:

"No building shall be erected on any lot except a one family dwelling house, a garage and one service building and used exclusively as such. Buildings shall be permanent structures of an attractive design. Duplexes may be built on Lots 34, 35, 36, 37 and 38.

No structure of a temporary character, trailer, basement, tent, shack, mobile home or garage shall be used on any Lot, at any time, as a residence, either temporarily or permanently."

The Collenbergers purchased a structure described as an "Armor Home" and a lot in the Brownfield subdivision from Rex McKee, another defendant, who is the president of Illinois Mobile Homes, Inc. A retail installment contract was used by the parties in the sale of the structure. It described the Armor Home as a mobile home and provided that title should remain vested in the seller until full payment was made. The Collenbergers were given a certificate of title which also referred to the Armor Home as a mobile home and stated its year of manufacture, its style or model and its serial number.

The Armor Home here is 52 feet long, 24 feet wide and has a total living area of 1,460 feet. It is manufactured in two separate sections which, when joined, provide three bedrooms, a living room, dining room, kitchen, a utility room and 1½ baths. The sections are built upon detachable running gears, *i.e.,* upon undercarriages, springs, axles, wheels and hitches, which are designed to permit their removal at the location where the structure is to be installed.

Prior to installing the Armor Home on their lot, the Collenbergers constructed a concrete foundation 52 feet long, 24 feet wide and 36 inches deep. Stacks of concrete blocks were placed on top of the foundation. Then, three steel I-beams were placed on top of the stacks. When the two sections were delivered at the lot, they were set on jacks which had been placed on the four corners of the foundation. Workmen then removed the detachable running gears from the two sections and lowered the two sections onto the I-beams. The sections were fastened together by angle irons and 16-penny nails.

After the sections were connected, a mason cemented the ends of the beams and the stacks of concrete blocks to the foundation. The mason also built a perimeter wall of building blocks which was cemented to the foundation. However, the bottom of the Armor Home was not cemented, welded or attached in any way to the I-beams or to the perimeter wall. The structure simply rested on the three I-beams. After the sections were joined aluminum enamel siding was installed on the sides of the structure. A family room was added connecting the Armor Home to a previously constructed garage.

Robert Collenberger testified that he knew of the covenant's restrictions when he bought the lot. He said that although the Armor Home after installation could be transported to another location by reattaching the running gear to the bottom of each section, the structure would first have to be dismantled. This would require removing

the aluminum siding, removing the bolts from the angle irons and the nails connecting the two sections, removing the shingles from the roof and disconnecting all the utilities.

Rex E. McKee testified that he sold the sectional home to the Collenbergers. He said that there is a difference between a double-wide mobile home and a sectional home. A double-wide home is two mobile homes constructed so that they may be fitted together to make a large mobile home, and it is portable, he said. A sectional home is designed to be a single dwelling with a single roof, and though it is constructed in two sections, it is not portable, he testified. He said that in his opinion the Collenberger's house was a permanent single house and not a mobile home.

He did admit, on cross-examination, that he had advertised the Armor Home as a "double wide mobile home." The advertisement read in part, "the double wide [mobile home] is composed of two mobile sections, either 10 feet or 12 feet wide, connected together at the homesite to form a 20 or 24 foot wide home. These homes are usually over 50 feet long."

Warren Huddleston, the president of Countryside Mobile Homes, Inc., testified that the difference between mobile homes and sectional homes is that a mobile home's running gear is designed to be a permanent part of the unit. He said that a sectional home's running gear is designed to be detached, that is, it is designed to be removed from the housing unit when the unit is placed on a foundation. He stated that the Collenbergers' house in his opinion is a permanent family dwelling and not a mobile home.

The defendants' contention is that their Armor Home is a sectional home and therefore not a mobile home. This contention relies upon the testimony of Rex McKee and Warren Huddleston that sectional homes and mobile homes have important differences. The defendants alterna-

tively argue that even if the structure was a mobile home, it became a permanent structure when it was placed on the foundation. The alternative argument is the one upon which the defendants proceeded in the trial court. In his opening statement their attorney said:

"If the court please, just briefly I would like to go through the facts of this case. This gentleman, Mr. Collenberger, moved a mobile home on this lot and converted it into a modular home. It was one of these units that can be used either as a mobile home or a modular home. If it is to be used as a modular home you have to remove the hitch and the undercarriage and wheels from it and put it on a permanent foundation."

A case with a strong resemblance to the one here is *Timmerman v. Gabriel* (1970), 155 Mont. 294, 470 P.2d 528. There the issue was whether the structure the defendants had installed on their lot was a trailer, the use of which was prohibited by a restrictive covenant that applied to their property. The covenant was similar to the one here. It provided:

"No structure of a temporary character, trailer, basement, tent, shack, garage, barn, or other out building shall be used on any lot at any time, as a residence, either temporarily or permanently, nor shall any residential structure be occupied for residential purposes until completely finished." 155 Mont. 294, 295-96, 470 P.2d 528, 529.

The structure and its installation were similar to the Armor Home and its installation.

"The Gabriels purchased a dwelling referred to in the industry as a 'double wide mobile home.' *** The mobile home was composed of 2 structures each 10 feet wide and 50 feet long; each was built similar to a typical trailer house in

several respects. Each section had a steel frame underneath with springs, axles, wheels and a drawbar and covered with metal siding. When bolted together the 2 structures formed a house 20 feet wide and 50 feet long with 1,000 square feet of floor space. The cost of this mobile home was approximately $13,500.

The 2 sections were hauled to the Gabriel lots in the Helena Valley Estates Subdivision, placed on a concrete block foundation and bolted together. The wheels, springs, axles and drawbars were removed and returned to the factory. A roof cap was put on the home and trim placed on the interior. A septic tank, propane tank, and power line were connected to the house. A water system from a well drilled on the site was attached to the house. Various trees were planted and some landscaping was done." 155 Mont. 294, 296, 470 P.2d 528, 529.

It was also observed:

"[T]he restrictive covenant being construed here is directed to a type of structure such as a trailer, basement, tent, shack, garage, barn or other outbuilding, and the prohibition extends to the use of those types of structures as dwellings because of the nature of their construction rather than their mobility." 155 Mont. 294, 298-99, 470 P.2d 528, 530.

The court concluded the structure was one prohibited by the restrictive covenant:

"The house the Gabriels placed on their property is very similar to the typical trailer house. It has metal siding, a metal frame to which is attached springs, axles, wheels and drawbars. The fact that some of these features may be removed, and were removed in the instant case, does not change the basic structure of the house itself. The structure

was sold to the Gabriels by a trailer sales firm while it was on their sales lot, mounted on wheels. It was later pulled to the Gabriels' lots by a trailer truck. The term mobile home is an advertising euphemism for a large house trailer and although the larger models of mobile homes are considerably less mobile than the smaller models, they are essentially similar in structure and appearance. It cannot be demonstrated that they are so essentially unlike a trailer as to exclude them from the general definition of 'trailer'." 155 Mont. 294, 298, 470 P.2d 528, 530.

In *Town of Manchester v. Phillips* (1962), 343 Mass. 591, 180 N.E.2d 333, a mobile home without wheels was placed by the defendant on a concrete foundation, 51 feet long, 20 feet wide and 4 inches deep. The municipality brought suit to require the removal of the home from land which the defendant also owned on the ground it violated a Manchester zoning bylaw which provided that only single-family dwellings could be used on the property in question. The bylaw specifically declared mobile homes were not to be considered single-family dwellings. The defendant's contention was that the structure was not a "mobile home" within the meaning of the ordinance because it was without wheels and because he was preparing to affix the structure to a concrete foundation.

The court rejected the contention:

"The words of the by-law, interpreted 'according to their natural import in common and approved usage' [citations], have equal application to this type of unit whether equipped with wheels or without them. They refer, we think, to this species of self contained unit, which frequently is in form a mobile trailer, in contrast with the conventional type of house usual in, and appropriate to, a single family residence district. In

ordinary parlance the unit shown in the exhibits will be spoken of as a trailer or a mobile home, even if it has not been sold with wheels or its wheels have been taken away, and even if it has been affixed to the land. It looks like a trailer, has the qualities of a trailer superstructure, and has been built as a trailer." 343 Mass. 591, 595-96, 180 N.E.2d 333, 336-37.

There is authority that modular and sectional homes are considered to be in the mobile-home category. B. Hodes and G. Roberson, The Law of Mobile Homes 4 (3d ed. 1974) states:

> "The mobile home is fully equipped and furnished by the manufacturer, and at the time of purchase is ready for immediate occupancy. The manufacturers of the modern mobile home have efficiently utilized between 720 and 1,440 square feet of living space, into which they have comfortably fitted every type of modern convenience, equipment, and facility found in a city apartment or ranch-style suburban home. Units which are expandable after location by means of a specially manufactured extension may increase the width of the living room and/or bedroom areas to 20 or 24 feet.
>
> Definitions used by manufacturers of the various types of housing units and most state and federal agencies in the mobile home category are:
>
> \* \* \*
>
> 4. A *Modular Unit* is a factory fabricated transportable building unit designed to be used by itself or to be incorporated with similar units at a building site into a modular structure to be used for residential, commercial, educational or industrial purposes.
>
> 5. A *Sectional Home* is a dwelling made of two or more modular units factory fabricated and transported to the home site where they are put on a foundation and joined to make a single house."

We consider the structure here must be deemed to be within the prohibitory language of the covenant, "no structure of a temporary character, trailer \* \* \*."

It was advertised as a double-wide mobile home in the

installment contract under which it was purchased. Photographs in evidence show it to have the superstructure and appearance of a mobile home. In Hodes and Roberson, The Law of Mobile Homes, which we have cited, it is said that sectional homes are regarded as within the mobile-homes category. There was a concrete foundation here but the structure was in no way attached to it or to the three I-beams on which the structure simply rested. The structure can be transported to another location after the two sections have been separated and the removable under-carriages reattached to the bottoms of the sections. One of the exhibits (an article from a trade journal) attached to the defendants' brief in this court refers to a modular unit's portability as a difference from and an advantage over the conventional home.

The majority of courts considering the question have held that removing the wheels or running gear of a mobile home and placing it on a permanent foundation does not convert the home into a permanent structure. In addition to *Timmerman v. Gabriel* and *Town of Manchester v. Phillips,* which we described above, such holdings include: *Town of Brewster v. Sherman* (1962), 343 Mass. 598, 180 N.E.2d 338; *Town of Greenland v. Hussey* (1970), 110 N.H. 269, 266 A.2d 122; *Bullock v. Kattner* (Tex. Civ. App. 1973), 502 S.W.2d 828; *Jones v. Beiber* (1960), 251 Iowa 969, 103 N.W.2d 364. See also *City of Astoria v. Nothwang* (1960), 221 Ore. 452, 351 P.2d 688.

There is some contrary authority: *Anstine v. Zoning Board of Adjustment* (1963), 411 Pa. 33, 190 A.2d 712; *Lescault v. Zoning Board of Review* (1960), 91 R.I. 277, 162 A.2d 807; *In re Willey* (1958), 120 Vt. 359, 140 A.2d 11. However, we consider the position taken in the majority of holdings is to be preferred.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*