Louis G. VINYARD, Dorothy J. Vinyard, Janice Lynn Lenhardt, Raymond W. Branstrom, and Ervin G. Miller, Appellants,

v.

ST. LOUIS COUNTY, Missouri, Appellant, and James V. Cornet and Patricia L. Cornet, Respondents.

No. 51247.

Supreme Court of Missouri, Division No. 1.

Jan. 10, 1966.

Motions for Rehearing or to Transfer to Court En Banc Denied Feb. 14, 1966.

Detjen & Detjen, Louis S. Czech, Clayton, for appellants, Louis G. Vinyard, et al.

Donald J. Stohr, St. Louis County Counselor, Thomas W. Wehrle, Associate Coun-

ty Counselor, Edward Lander, Asst. County Counselor, Clayton, for appellant.

Bertram W. Tremayne, Jr., and Tremayne, Joaquin, Lay & Carr, Ludwig Mayer, Clayton, for respondents, James V. Cornet and Patricia L. Cornet, his wife.

HOUSER, Commissioner.

This is a class action brought by six residents of Saxon Manor No. 2, a subdivision in St. Louis County, against the county and James V. Cornet and wife, for a declaratory judgment to construe the rights of the parties under county ordinances regulating subdivisions and zoning and under subdivision deed restrictions; to declare the use of portions of two lots for roadway purposes illegal and a violation of the ordinances and restrictions and to enjoin the granting or issuance of a subdivision permit for roadway purposes or the use of the strip of land in question as a roadway. The county answered that the use violated the ordinances; that the portions of the two lots were neither properly established as a road nor properly subdivided. The Cornets claimed right of user as bona fide purchasers to whom a permit had been issued and cross-petitioned for the creation of a statutory roadway by necessity. The court found for the Cornets and the county and plaintiffs appealed. This court has jurisdiction because a county as such is a party. Const. Art. V, § 3, V.A.M.S.

Idamor Development Corporation (hereinafter Idamor) owned a sizeable tract of land which it developed as a subdivision. All of the lots were sold to M. Shapiro & Sons, Inc. (hereinafter Shapiro). The officers of Idamor and Shapiro were the same persons: Stanley Shapiro, Kenneth Shapiro and Donald Sontag. These three were also the trustees of Saxon Manor No. 2. Shapiro built houses on the lots and sold them subject to recorded subdivision restrictions. Idamor owned a 4.2-acre tract (hereinafter Parcel 1) adjoining the subdivision. There was no access to Parcel 1 by way of any street or road. Lots 150 and 151 were platted wider than most of the lots in the subdivision. When they were sold Shapiro reserved 25 feet off each, thus creating a 50-foot strip between them. This 50-foot strip will be referred to as Parcel 2. Parcels 1 and 2 were sold in one transaction to the Cornets for the development of a multiple dwelling apartment complex on Parcel 1, access to which was to be had by using Parcel 2 as a roadway. This litigation arises out of the conflicting claims of the parties as to the right of the Cornets to thus use the 50-foot strip of land known as Parcel 2. A résumé of agreed facts in chronological order follows.

In December 1962 Shapiro gave Cornet an option to purchase Parcels 1 and 2. In February, 1963 an earnest money purchase contract was executed. Cornet caused plans for the development of the land and the construction of the apartment buildings to be prepared. These plans were submitted to the public works director of the county in March. Cornet was advised that the plans could not be approved until the county planning commission granted permission and the board of adjustment agreed to the use of Parcel 2 as a way of ingress and egress between Parcel 1 and Medaford Lane, the street in the subdivision on which Lots 150 and 151 face. Cornet advised Shapiro that the earnest money contract could not be closed until necessary permits were secured and plans were approved. Stanley Shapiro agreed to take care of the matter and the closing date was extended. On April 8 Idamor, per Stanley Shapiro, presented to the county planning commission a request for a subdivision exception in which petitioner requested the commission's approval of the establishment of a 50-foot roadway between Lots 150 and 151 in order to gain access to Parcel 1. On April 12 Idamor, per Stanley Shapiro, presented to the board of zoning adjustment its

petition requesting an exception to the established front yard line of 30 feet on Lots 150 and 151 so as to maintain a 7-foot front yard "due to construction of a street between the two lots." At the time Idamor filed these petitions in April, 1963 the petitioner, Idamor, no longer owned Parcel 2. Title thereto was then vested in M. Shapiro & Sons, Inc. The remaining portions of Lots 150 and 151, upon which houses had been built, were then owned by plaintiffs Lenhardt and Vinyard, respectively. On April 15 Cornet secured a title report which stated that Parcel 2 was affected by building lines and subdivision restrictions of record. The petition for a subdivision exception, at first denied by the planning commission, was reconsidered and continued until July 2, at which time the planning commission granted the subdivision exception, subject to the granting by the board of zoning adjustment of an exception to the front yard requirements and subject to the installation of improvements to county standards. Immediately after July 2 Shapiro notified Cornet that the required permission of the county planning commission had been granted. The petition for an exception to front yard requirements was not acted upon when presented on April 12, one member of the board having requested that a letter of notification be sent to the owners of Lots 150 and 151. On July 12 Idamor's petition for an exception to the front yard requirements was granted by the board of zoning adjustment. On the same day Cornet again presented the plans for the development of Parcels 1 and 2 and the construction of apartment buildings to the public works director, whose employee, deputy zoning enforcement officer Edward Walton, approved the plot plan after making several changes. Cornet paid the required fee and the department of public works issued its permit authorizing Cornet to build the 5 multiple family apartment buildings. Cornet then submitted the plot plan to the trustees of

Saxon Manor No. 2 for approval. In the latter part of July Cornet obtained a $435,000 loan commitment from a bank for land acquisition and construction purposes. On August 2 Cornet closed the contract for purchase of Parcels 1 and 2 with Idamor and Shapiro and on that date Cornet and his wife took title by deeds subject to building lines and restrictions of record. The Cornets executed a promissory note for $435,000 and gave a deed of trust on the property as security. On August 5 the subdivision trustees approved Cornet's plan for construction of a 26-foot wide asphaltic paving as a street over Parcel 2, subject to "no parking" requirements. Construction of the buildings was commenced on August 5. Cornet and his agents, servants, subcontractors, invitees and others entered and went onto the construction site from Medaford Lane over and across Parcel 2, the 50-foot strip of land in question. In August, September and October Cornet installed water and gas lines in and through the 50-foot strip, connecting with existing lines and mains within the right of way of Medaford Lane. In August plaintiff Lenhardt permitted Cornet's foreman to connect water lines into Lenhardt's water supply at his residence, to supply water at the construction site under an agreement, kept by Cornet, to reimburse Lenhardt for the water used.

On August 21 the county planning commission advised Idamor that prior to the issuance of a subdivision permit by the commission it would be necessary to submit improvement plans for the proposed road and prior to recording the subdivision plat it would be necessary to either install all improvements or post a bond of escrow to guarantee installation. Idamor transmitted the letter of notification to Cornet in August or September. On September 30 Cornet procured a 30-day special use permit from the division of highways, department of public works, authorizing the installation of a driveway into Medaford Lane from Parcel 2, and commenced con-

struction of the driveway, installed concrete curbs, a storm water catch basin at the entrance of the lane and placed rock on the 50-foot strip of land. On October 3 the planning commission advised Cornet that its building permit issued July 12 would be revoked unless Cornet immediately contacted the commission to obtain "the required subdivision permit." Cornet got in touch with the planning director of the commission, who informed him that he should submit a subdivision plat for the resubdivision of Lots 150 and 151 showing the proposed street and either dedicating the street for public use or executing a private maintenance agreement with the county, and that he should submit plans for the construction of the street in accordance with county standards to the division of highways for approval. Cornet caused the plat and plans to be prepared and on October 7 submitted them to the planning director. Plaintiffs filed suit on October 17. The street plans were approved by the division of highways on October 22. On October 23 Cornet submitted to the planning director an escrow agreement in the amount of $2,249.75 to guarantee completion of the improvements, as required by the latter, who on October 24 transmitted the plat, plans and escrow agreement to the St. Louis County Council, with a letter recommending approval. On November 7 the county council conducted a public hearing. Fifty or more residents of Saxon Manor No. 2 appeared and protested. On November 21 the county council denied approval of the subdivision plat of the resubdivision of Lots 150 and 151. On December 12 the department of public works issued an occupancy permit for 14 apartment units all in the one building which had been completed. Since then the other four buildings have been completed, but occupancy permits for them have been withheld.

In addition to the foregoing facts, which were stipulated, oral evidence was introduced. Residents of the subdivision testified that there was no roadway over Parcel 2 when they purchased their homes in 1959 and 1960; that they bought into this restricted area relying upon the restrictions and the brochures and plats shown them which indicated no roadway between Lots 150 and 151. Vinyard testified that he thought the strip was "just an easement" belonging to the electric company. From other and more convincing evidence, however, the court finds that as early as 1957 or 1958 rock was put upon the 50-foot strip; that it was used as a roadway from that time on by Shapiro, Shapiro's contractors, the sewer district and the electric company; that prospective buyers of lots in the subdivision were told that there was a roadway between Lots 150 and 151 and that this strip was for access to the rear parcel; that water company trucks would park on the 50-foot strip at the back of Vinyard's lot and walk down the roadway; that the rocked area was 150 feet in length; and that sewer district employees used the roadway at least three times a week to service the district's pumps located on Parcel 1. On the day the contract for the purchase of Parcels 1 and 2 was closed, August 2, an escrow account was opened at Security Title Company on the basis of a loan of $435,000 and $50,000 was drawn by Cornet. By October 17, when suit was filed, the project was half completed. All five basements had been installed, underground plumbing was partially completed, slabs poured, the site graded, three buildings were under roof, the last brick work on all buildings was being completed, electrical, heating and plumbing contractors were roughing inside and the buildings were being partitioned. On October 17 $200,000 had been drawn into the escrow account from the loan and $165,000 for construction costs and $34,625 for ground acquisition, title, loan and other costs had been disbursed, and other costs incurred but not paid for amounted to between $30,000 and $70,000. By November 10 $300,000 had been drawn and $226,150.06 had actually been paid out. By the time

of trial all $435,000 had been paid into the escrow account and $418,709.32 had been paid out. The project was then substantially completed and 22 apartments were under lease, of which 15 were occupied.

Although the residents of the subdivision were not notified of the request for amendment of the subdivision restrictions or of the hearings on the petition for an exception, Saxon Manor Improvement Association, consisting of 98% of the property owners, employed counsel to investigate the situation, as a result of which a letter was written to the county planning commission on August 9 protesting the use of the 50-foot strip as a roadway. The deputy zoning enforcement officer notified plaintiffs Dorothy J. Vinyard and Janice Lynn Lenhardt of the hearing on July 12 and that they could appear and make any statement they desired but neither they nor any other interested members of the public appeared. The improvement association held a meeting in September to acquaint the members with the facts insofar as they were able to determine them. The membership was highly aroused and voted unanimously to do everything in their power to "stop this thing." When plaintiffs filed suit they did not ask for a stay order, seek a temporary injunction, or give an indemnity bond to arrest the construction, which proceeded without interruption (except for vandalism) until the work was completed.

Vandalism began during the third week of construction. Underground pipes were filled with gravel. Surveying stakes were knocked out. Foundation forms were knocked down. Condensers for air conditioners were smashed and the mechanisms torn up. Windows were shot out of the construction bus by shotguns. The construction telephone was torn off three times. Temporary electric service on the construction bus was torn off twice. The sewer contractor's men were shot at on one occasion. Several garbage disposals were ripped out. More than 16 thermo-

stats had the mercury capsules ripped out. On one night 22 windows were broken out. Buckets of paint were thrown on the buildings. Paint was thrown on the inside walls and floor of two units. Several floors had to be replaced. Guards were hired at a cost of $4,000. Vandalism costs exceeded $3- or $4,000. There is no evidence connecting the vandalism and the plaintiffs, but we find that some of the plaintiffs engaged in demonstrations, which began on November 8 or 9, 1963 on Medaford Lane at the entrance to the 50-foot strip leading to the construction site. Residents of the subdivision parked a line of cars across the strip and blocked all ingress and egress. A large number of people gathered. People would run in and out of various homes in groups, especially at the Vinyard home, which appeared to be headquarters. This happened on several occasions. Each morning during the second week of demonstrations people attempted to block Cornet and his workmen by forming a physical barrier with their bodies or cars at the entrance. These demonstrations continued sporadically until the end of 1963. Each time the police were called. On Sundays when the apartments were advertised for rent people congregated at the entrance, carried banners, stopped automobiles and discouraged prospective renters from leasing the apartments. A balled and burlapped cedar tree was placed in front of a sign advertising the apartments in a manner so as to obscure the wording on the sign. The word "OPEN" was painted out on a sign.

Mr. Wagner, director of the planning commission, testifed that the creation of the 50-foot strip by the sale of the other portions of Lots 150 and 151 violated subdivision regulations; that a subdivision permit from the council is needed any time a piece of property is divided into parcels of less than three acres and that such a permit was necessary to establish this 50-foot parcel of ground as a roadway; that before any plat could be re-

corded it must be approved by the county council; that it is not good planning to divide two lots into two parcels to use as a driveway through a single family residential area to multiple dwelling units or to run traffic generated by a multiple family development through a residential area, except where it connects up directly with a collector-type road.

Stanley Shapiro testified that when the planning director told him that a road exception from the planning commission and board of adjustment action on the side yard were needed he said nothing about a subdivision permit or the need of county council approval.

Parcel 2 is the only practical and inexpensive route by which access may be gained to. Parcel 1. Four other suggested possibilities involve expenditures of from $41,500 to $101,290, even if the right of way could be obtained. These routes would be from 1,600 to 2,800 feet in length. Severe variations in elevation, drainage ditches, swales, railroad crossings, and obstacles such as natural gas pipelines would have to be overcome. A Union Electric Company real estate agent testifed that his company owns real estate available for road purposes which "he" would be willing to grant to Cornet and dedicate for public use but neither this agent nor his superior was an officer of the company and he admitted that neither had been given specific authority to give this particular right of way.

The first question is whether the use of Parcel 2 as a driveway or roadway from Medaford Lane to Parcel 1, on which the multiple dwelling apartments are built, constitutes a violation of the subdivision restrictions. Section 4 of the restrictive covenants provides that "All lots shall be known and described as residential lots. No structure shall be erected on any residential building lot other than one detached single family dwelling which shall not exceed two stories in height." Section 9 provides that "No residence shall be used directly or indirectly for business of any character or for any purpose other than that of an exclusive private residence for one family."

■ Restrictions upon the use of real property, being in derogation of the fee, are not favored. They are strictly construed. Doubts in connection therewith are resolved in favor of the free use of the property. Restrictive covenants will not be extended by implication to include anything not clearly expressed in them. Albrecht v. State Highway Commission, Mo.Sup., 363 S.W.2d 643, 645 [2]; Barnes v. Anchor Temple Association, Mo.App., 369 S.W.2d 893, 898.

■■ Plaintiffs contend, in effect, that the use of the 50-foot strip of land in this subdivision restricted to single family occupancy constitutes multiple dwelling usage of the strip for business purposes because it will be used as a means of ingress and egress to and from a tract on which multiple dwelling apartments are located. The Missouri cases cited by plaintiffs in support of their contention are to be distinguished from the instant situation. In the Missouri cases either the restriction was against the use of the *land* or the building allegedly violating the covenant was constructed or proposed to be constructed directly on the land subject to the restriction.[1] Plaintiffs' cases from other jurisdictions [2] may not be so distinguished and are analogous on the facts but we are not persuaded to follow them. Our rule against the extension of

1. Andrews v. Metropolitan Bldg. Co., 349 Mo. 927, 163 S.W.2d 1024; Noel v. Hill, 158 Mo.App. 426, 138 S.W. 364; Sanders v. Dixon, 114 Mo.App. 229, 89 S.W. 577; Miller v. Klein, 177 Mo.App. 557, 160 S.W. 562; Pierce v. Harper, 311 Mo. 301, 278 S.W. 410.

2. Mellitz v. Sunfield Co., 103 Conn. 177, 129 A. 228; Laughlin v. Wagner, 146 Tenn. 647, 244 S.W. 475; Starmount Co. v. Greensboro Memorial Park, 233 N.C. 613, 65 S.E.2d 134, 25 A.L.R.2d 898; State ex rel. Stalzer v. Kennedy, 46 Ohio App. 1, 187 N.E. 640.

restrictive covenants by implication runs counter to the rationale of the cases from other states. Our rule is well exemplified in Albrecht v. State Highway Commission, supra, in which we held that the construction of a highway did not violate a restrictive covenant providing that no residence or building on any residence lot should be used directly or indirectly for business of any character or for any purpose other than that of an exclusive private residence. The reasoning adopted in that case is fully applicable here. In the restrictions now before us there is no prohibition of the use of any lot in the subdivision as a roadway, driveway or street leading to adjacent land. Neither § 4 nor § 9 prohibits the use of any *lot* for any other than residential purposes. It is not the use of the *land* that is restricted. The restriction goes to the *type of structure to be erected* upon the land and the *use of the structure* erected thereon. Cornet did not erect any structure on Parcel 2 unless it may be said that a driveway, underground water lines or gas mains are structures. Considering the word "structure" in the context in which it is used we interpret it to refer to buildings as structures and not to driveways, water lines or gas mains. Cornet has not used any residence building in the subdivision for business purposes and does not propose to do so. The use of Parcel 2 as a roadway or driveway between Medaford Lane and Parcel 1 is not the use of a "residence * * * directly or indirectly for business of any character or for any purpose other than that of an exclusive private residence for one family."

■ Reliance is placed upon the preamble to the restrictions, which recites that "Whereas, it is the desire and purpose of the owners of the said subdivision, for the purpose of benefiting the several lots into which they have been subdivided, and the purchasers thereof and their successors and assigns to make said subdivision desirable residential area and to that end to impose the restrictions, conditions and provisions hereafter set out with respect thereto * * *." As pointed out in Albrecht, recitals of this kind generally are not strictly a part of the contract and, while of value in determining intent, they do not extend and broaden the contract stipulations where, as here, the recitals are broader than the stipulations. 363 S.W.2d l. c. 646 [4, 5].

■ The use of Parcel 2 as a driveway or roadway does not violate the subdivision restrictive covenants. Plaintiffs maintain however, that since Cornet took title to real property subject to the previously recorded restrictive covenants of which he had actual knowledge, he does not come into court with clean hands, was not a bona fide purchaser and should be estopped to deny that the covenants prohibit his use of the ground for business or multiple dwelling purposes. This overlooks the fact, however, that Stanley Shapiro, at the instance of Cornet, filed petitions with the county planning commission and the board of zoning adjustment and obtained official authority to use this land as an exception to the subdivision and front lot line requirements of law, and that Cornet applied to the trustees of the subdivision and received their approval of his plans for the construction of the roadway over a portion of the subdivision.

The next question is whether the county zoning or subdivision ordinances were violated by the creation of the 50-foot strip of land over parts of Lots 150 and 151 or by the use by Cornet of that strip for driveway purposes. Appellants contend that under the ordinances the splitting off of 25 feet from each of the lots constituted a "subdivision" of land which had to be shown on a plat and that such a subdivision could be made legally only after obtaining a subdivision permit, the issuance of which depends upon prior approval of the plat by the planning commission *and by the county council.*

§ 1003.330(2) of the zoning ordinance prohibits the change of the uses of any land without first obtaining a permit from the zoning enforcement officer which shall issue only when the request therefor is in conformity with the county Subdivision Regulations, after applicant has secured a subdivision permit from the planning director.

§ 1004.070 authorizes the board of zoning adjustment to permit a variation in the yard requirements of any zoning district where there are practical difficulties or unnecessary hardships in the carrying out of zoning provisions.

§ 1005.030 of the Subdivision Regulations provides that a subdivision of land is

"(1) The division of land into two or more tracts, sites or parcels of three acres or less in area; * * * (3) dedication or establishment of a road, highway or street through a tract of land regardless of area, and (4) resubdivisions of land heretofore divided or platted into lots, sites or parcels, containing one acre or more or a total area of one acre or more.

"(Note: Any sale or contract of sale or agreement to purchase any lot or division of land either by lot description or by metes and bounds as defined in the preceding portion of this section shall constitute a subdivision of land and require, prior to any sale or contract of sale or agreement to purchase and before the delivery of a deed the submission of a plat to the Commission as required by law; provided, however, that this shall not apply to land in subdivisions previously recorded, to sales of land used or to be used for orchards, forestry or the raising of crops, upon certification by the Commission or to the sale or exchange of small parcels of land to or. between adjoining property owners, where such sale or exchange does not create additional lots, or upon certification which must be granted by the Commission.)"

§ 1005.040 provides that

"Every subdivision of land within the unincorporated area of St. Louis County shall be shown upon a plat and submitted to the Commission for approval or disapproval. Any plat which has been approved by the Commission and its approval endorsed therein in writing shall be submitted to the County Court for its consideration, approval or disapproval. If the Commission does not approve the plat or if the legislative body or an incorporated area files a written protest with either the Commission or the County Council against any plat within one-and-one-half miles of its border it may then be approved by the County Council only in accordance with the provisions of Section 64.070, RSMo 1949. No plat shall be recorded in the office of the Recorder of Deeds and no lots shall be sold from such plat unless and until approved as hereinabove provided."

§ 1005.200 authorizes the county planning commission to vary or modify subdivision regulations if the tract to be subdivided is "surrounded by such development or unusual conditions that the strict application of the requirements contained in these Regulations would result in real difficulties and substantial hardships or injustices, * * *."

Appellants urge that there was a subdivision of land (1) by the establishment of a road or street on Parcel 2 [under situation (3) of § 1005.030], and (2) by splitting Lots 150 and 151, conveying portions and retaining 25-foot strips thereof [under situation (1) of § 1005.030].

█ It certainly may not be said that there was a subdivision of Parcel 2, within the meaning of situation (3) above, by the establishment of the roadway through it. Such a subdivision obviously contemplates a larger parcel than a 50-foot strip, 26 feet of which was occupied by the roadway itself. Nor can it be said that there was a subdivision of Parcel 1 by the es-

tablishment of the access road, which ran to the middle area of the 4.2-acre tract on which apartments were built, but did not run "through" it.

■ Technically and literally speaking, a division or subdivision of land occurred when portions of Lots 150 and 151 were conveyed, reserving 25-foot strips from each. In our judgment, however, this manner of conveyancing did not constitute "a subdivision of land" within the meaning and intent of § 1005.030. The creation of the 50-foot strip falls within two of the exceptions stated in the note following that section.[3] One exception is "land in subdivisions previously recorded." That fits this case. Saxon Manor No. 2 is a subdivision the plat of which was previously recorded. Apparently the drafters of the ordinance considered that the zoning requirements would be sufficient to maintain adequate control over the subdivision of lots within a platted subdivision, and that the relatively insignificant act of dividing a lot in a subdivision was not sufficiently important to require compliance with the complex and onerous procedures imposed upon subdividers of land in the usual and ordinarily accepted sense of the term "subdivision." Another exception applies "upon certification" by the county planning commission, which we construe to include the action of the commission in granting a request for an exception to subdivision requirements, which in effect is a certification or attestation and approval of a proposed course of action as in conformance with acceptable standards and requirements. The July 2 order of the commission was not conditioned upon obtaining further approval by the county council. The planning director's letter of August 21 stating that a subdivision permit would be required was not made pursuant to any commission order of record and was not appropriate since this case fell within the exceptions above noted. Before the roadway was constructed all necessary authorizations and permits from public bodies were obtained, and it was not necessary to prepare or submit a "subdivision plat" to the planning commission or to the county council for approval.

■ Plaintiffs challenge the right of Idamor to file and present the petition to the board of zoning adjustment on the theory that the petitioner, Idamor, was not the owner of Lots 150 and 151 at that time; that Idamor was then a stranger to the title and could not be aggrieved by any building line restrictions. § 1004.100(1) authorizes appeals to the board by any person or corporation "allegedly aggrieved by * * * any * * * adminstrative decision" based upon any zoning regulation. Idamor and Shapiro had contracted to sell Parcels 1 and 2, respectively, to Cornet. The public works director refused to issue a building permit to Cornet until certain authorizations were had from public bodies. Idamor's sale of Parcel 1 (the most valuable part of the transaction) was thereby jeopardized. The contract for the sale of Parcel 1 could not be closed on the closing date fixed in the contract, which had to be extended. The sale of the property was contingent upon the granting of the requested variance. Since the sale could not have been consummated under the administrative ruling Idamor stood to lose its sale and therefore was aggrieved and was a proper party to file and present the petition for an exception.

Since neither the subdivision restrictive covenants nor the county ordinances were violated, and all necessary authorizations, exceptions, permits and requirements were obtained and met, there was no occasion to issue an injunction. We do not reach the questions raised with reference to laches, unclean hands, disproportionate

---

3. The evidence showed that the note to § 1005.030 was printed in the original subdivision regulations that were adopted in 1942 and has been a part of the section from that time.

damage, etc. The judgment entered was proper and is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.