Robert BRASHER and Jill Brasher, his wife, Plaintiffs-Respondents,

v.

Raymond E. GROVE and Audrey F. Grove, his wife, Defendants-Appellants,

Eldon J. Smith and Phyllis Hensel Smith, his wife, Intervenors-Respondents.

No. 9962.

Missouri Court of Appeals, Springfield District.

May 10, 1977.

Pettit, Meyer & Woodcock, Aurora, for defendants-appellants.

Robert S. Wiley, Crane, for intervenors-respondents.

Gary W. Allman, Cantwell & Allman, Branson, for plaintiffs-respondents.

PER CURIAM.

Plaintiffs Robert Brasher and Jill Brasher and their allies, intervenors Eldon J. Smith and Phyllis Hensel Smith, sought a mandatory injunction requiring the defendants Raymond E. Grove and Audrey F. Grove to remove "five units"[1] from defendants' lots which are located in Valley View Beach Subdivision, Stone County, Missouri. Plaintiffs and intervenors own other lots in the subdivision. The trial court granted the injunction and ordered defendants to remove the five units. Defendants appeal.

The plat of the subdivision contains certain restrictions whose validity is conceded by the parties. The restriction which is involved here reads:

"2. No tents, trailers, or temporary buildings other than those used collateral to the construction of a permanent building shall be constructed on these lands."

The plat further stated that the covenants would run with the land and that violations of any restriction entitled any landowner in the subdivision to obtain a mandatory injunction.

The issue on this appeal is whether the five units are "trailers" or "temporary buildings" within the meaning of the restriction, there being no contention that they were used "collateral to the construction of a permanent building."

The trial court found that the five units were "trailers or mobile homes." Plaintiffs and intervenors, respondents here, argue that the units are trailers or temporary buildings but they put more emphasis upon their assertion that the units are trailers. Defendants argue that the units are neither trailers nor temporary buildings within the meaning of the restriction. This court agrees with defendants.

Restrictive covenants are not favorites of the law. Where their meaning is properly open to construction, they will be strictly construed. They will not be extended by implication and any reasonable doubt as to their meaning will be resolved in favor of free use of the land. If the language of the governing instrument is plain, no construction is necessary. The intention of the parties may be gathered not only from the specific clause under scrutiny but in light of all other provisions. Unless it appears that the words of the restriction are intended to be used in a technical or limited sense, the language is to be read and applied according to the plain, everyday or popular meaning of the words.[2] However, the principle that restrictions as to the use of real estate should be strictly construed and doubts resolved in favor of the free use of property should never be applied in such a way as to defeat the plain purpose of the restriction.[3]

The burden of proof was on the plaintiffs (and intervenors) to show that the five units were included in one of the cate-

---

1. Although removal of other structures had originally been sought, apparently defendants agreed to remove them. Defendants' appellate brief states that "this appeal is directed solely to the five units." Accordingly only that portion of the trial court's decree which required removal of the five units is involved here.

2. Each of the preceding statements is supported by *Hanna v. Nowell*, 330 S.W.2d 595,

599[1–5] (Mo.App.1959) and authorities there cited.

3. *Buoncristiani v. Randall*, 526 S.W.2d 68, 72[6] (Mo.App.1975); *Greenberg v. Koslow*, 475 S.W.2d 434, 436[2] (Mo.App.1971); *Jones v. Haines, Hodges & Jones Bldg. & Develop. Co.*, 371 S.W.2d 342, 344[2] (Mo.App.1963).

gories proscribed by the restriction. *Lake Development Enterprises, Inc. v. Kojetinsky*, 410 S.W.2d 361, 366[4] (Mo.App.1966); 20 Am.Jur.2d Covenants, Conditions, etc., § 323, p. 892.

The five units were manufactured for Holiday Inn of America. For five or six years they were a part of the Holiday Inn in North Little Rock, Arkansas. Each unit is 56 feet long and 10 feet wide and contains four sub-units. Each sub-unit is a "complete motel unit" containing a shower, toilet, hot water tank, air conditioner, and furniture.

Holiday Inn of America decided to build a "high-rise" on the land where the five units were located and sold the units to Robert Hawkins who was one of the witnesses for defendants. Hawkins obtained title to them by a bill of sale. The units did not have wheels, axles, tongues, or hitches, and had never had such. Hawkins moved the units from Arkansas to Missouri on a lowboy, "like you move a house," and the witness had "moved a lot of houses." In the summer of 1973 Hawkins sold the units to defendants.

From Fordland, Missouri, where Hawkins had temporarily stored the units, defendants moved them to the subdivision. Defendants "had a special axle with wheels rigged up so that they could be put on each unit" and each unit was moved by use of that special rig. Once a unit was placed on defendants' land, the special rig was removed, taken back to Fordland and placed on the next unit so that it could be moved to defendants' land.

Each unit is twice as heavy as a mobile home of comparable size. Each has a steel exterior and a Spanish type roof. Defendants placed the units on "footings in cement and some are on concrete blocks or dirt. You have to wait until after a freeze and thaw before you put them on a permanent foundation because they might settle." The units were attached to sewer, water, and electricity facilities. Defendants' evidence showed that they intend to "bolt down the units," "cross-tie them with a cable" before "putting on skirts."

Webster's Third New International Dictionary defines "trailer" as follows: "A vehicle or one in a succession of vehicles hauled usually by some other vehicle; a nonautomotive highway or industrial-plant vehicle designed to be hauled, as by a tractor, motor truck, or passenger automobile; an automobile-drawn highway vehicle designed to serve wherever it is parked as a dwelling or as a place of business, as an office, laboratory, or field headquarters."

The American Heritage Dictionary of the English Language defines "trailer" as follows: "A large transport vehicle designed to be hauled by a truck or tractor; a furnished van drawn by a truck or automobile and used as a house or office when parked."

"The word 'trailer' is defined generally as meaning one who or that which trails. The term is applied to a variety of vehicles, and in the motor vehicle law a trailer is a separate vehicle which is not driven or propelled by its own power, but which, in order to be useful, must be attached to, and become a part of, another vehicle." 87 C.J.S. Trailer p. 885.

A common ingredient of the foregoing definitions of "trailer" is the word "vehicle." The latter, says Webster, is "a means of carrying or transporting something, a conveyance." The units here involved do not fall within any of the foregoing definitions of "trailer." They were not "vehicles." They were not "designed to be hauled by a truck or tractor." Even though they were in fact hauled by a lowboy, that incidental experience played no part in their design.

The excellent briefs filed by plaintiffs, intervenors, and defendants make no mention of a Missouri case factually apposite, and the research of this court has been similarly unproductive.

Cases from foreign jurisdictions deal with trailers and mobile homes insofar as they are governed by restrictive covenants or zoning regulations. Most of these cases involve structures which were *originally* trailers but from which the wheels, axles, and other portions of the undercarriage had been removed and which had been set on a

permanent foundation and hooked on to various services and utilities. The majority of these cases holds that the structure, originally a trailer, remained a trailer [4] despite the permanent nature of its installation.

The minority view is that a structure, although originally a trailer, loses its classification as such when its attachment to land is of a permanent nature.[5]

Although acceptance of the minority view would justify a finding that the units are not "trailers," the same conclusion can be reached for other reasons. These units were not trailers on completion of their manufacture nor have they undergone any alteration to make them such. Two cases have been found in which restrictive covenants were sought to be enforced against structures which bore similarity to trailers but *which had never been such.* In each case injunctive relief was denied, the structure not being within the class proscribed by the restriction. Those cases are *Crawford v. Boyd*, 453 S.W.2d 232 (Tex.Civ.App. 1970) and *Vickery v. Powell*, 225 S.E.2d 856 (S.C.1976).

In *Crawford* the restriction was against "trailer homes." The evidence showed that the defendant contracted with a mobile home manufacturing company to build him a building 12 feet wide by 64 feet long. Before buying the building he built a concrete foundation for it. When he bought the building he did not order any axles or wheels to go with it and he did not get any.

The mobile home company brought the building out to his lots with a special truck that had a fifth wheel. They pulled it there with a tractor and when they brought it out they had axles and wheels under it. When they got the building onto defendant's property they set it on the concrete foundation and took the wheels and axle out from under the building and took them back with them. After referring to definitions of "trailer" and "vehicle" essentially the same as those appearing earlier in this opinion, the court said at p. 235:

"The structure complained of was built by a mobile home company and from its description it looked a lot like a mobile home in that it was 12 feet wide and 64 feet long, with a wooden frame and with the exterior siding of aluminum. But it did not have axles or wheels. The owner never intended to use it as a trailer or as a vehicle. He bought it for the purpose of putting it on his lots, affixing it to his realty, and he says his intentions are to use it from now on as a home for himself and family at the location where it has been placed. It is tied to the ground with cables and connected to the septic tank and has become a part of the real estate."

The court said it was obvious that the trial court could properly have found that the structure complained of was not a "trailer home."

---

**4.** *Brownfield Subdivision, Inc. v. McKee*, 61 Ill.2d 168, 334 N.E.2d 131 (1975); *Jones v. Beiber*, 251 Iowa 969, 103 N.W.2d 364 (1960); *City of Astoria v. Nothwang*, 221 Or. 452, 351 P.2d 688 (1960); *Town of Brewster v. Sherman*, 343 Mass. 598, 180 N.E.2d 338 (1962); *Town of Manchester v. Phillips*, 343 Mass. 591, 180 N.E.2d 333 (1962); *Timmerman v. Gabriel*, 155 Mont. 294, 470 P.2d 528 (1970); *Town of Greenland v. Hussey*, 110 N.H. 269, 266 A.2d 122 (1970); *Phillips v. Zmotony*, 525 S.W.2d 736 (Tex.Civ.App.1975); *Bullock v. Kattner*, 502 S.W.2d 828 (Tex.Civ.App.1973); *Smith v. Bowers*, 463 S.W.2d 222 (Tex.Civ.App.1970).

In *Jones* the court said: "Giving the word 'trailer' its usual and common meaning . . . and notwithstanding its transformation . . . it still retains its basic characteristic of 'being designed to be hauled.'" In *Town of Manchester* the court said: "It looks like a trailer, has the qualities of a trailer superstructure, and has

been built as a trailer." In *Town of Brewster* the court held that the trailer remained a trailer "whether it be still mobile or affixed with substantial permanence to the land."

**5.** *Manley v. Draper*, 44 Misc.2d 613, 254 N.Y. S.2d 739 (1963); *Hussey v. Ray*, 462 S.W.2d 45 (Tex.Civ.App.1970); *In re Willey*, 120 Vt. 359, 140 A.2d 11 (1958).

In *Manley* the undercarriage (wheels, springs and drawbar) were removed from a mobile home and it was set on a concrete foundation. The court admitted that it could be moved from its foundation but said: "so can any wooden frame constructed house." In *Willey* a trailer was mounted on cinder blocks and timbers but still had its wheels attached. The court said: "A metamorphosis has occurred; the mobile vehicle has become a fixed residence."

In *Vickery* a defendant had a home which had "the shape and appearance of a mobile home" but which "was constructed from the ground up and was not, and had never been, mobile." The restriction banned the installation of a "trailer home" or "mobile home." The supreme court agreed with the trial court that Vickery's home was not a mobile home or trailer within the meaning of the restriction.

This court concludes that the trial court was not justified in finding that the five units were "trailers" within the meaning of the restriction.

■ The contention of plaintiffs and intervenors that the units were "temporary buildings" within the meaning of the restriction seems inconsistent with their paramount, and now rejected, contention that they were trailers. Photographs of the five units were admitted into evidence below and have been inspected here. The units are of metal construction but that fact alone does not render them violative of the restriction.[6]

None of the witnesses for plaintiffs or intervenors had inspected the five units at close hand. They offered no testimony with regard to the life expectancy of the units. There was no showing that these units would not endure as long as ordinary frame houses. The burden was on plaintiffs and intervenors to prove a violation of the restriction and such proof is lacking to support a finding, and the trial court made none, that these buildings were of a type properly to be described as "temporary." The fact that they were moved from their prior situs in Arkansas to their present location would not, standing alone, render them "temporary" structures. Houses and even larger buildings have been moved from one location to another without losing their trait of permanence. Indeed their lasting qualities are usually a reason to move them

so that they may be preserved at another place.

If the designer of Valley View Beach Subdivision had intended to ban structures of the units' type, appropriate language could have been employed. Buildings of metal exterior could have been banned, buildings having the shape or general external appearance of trailers could have been banned, but such was not done. This court has no authority to add to the restrictions which were imposed.

The judgment is reversed.

All concur.

---

6. Another restriction in the Valley View Beach Subdivision plat reads:

"3. No permanent building shall have an outer covering of tar paper, imitation stone, or brick siding having an asphalt base."

Presumably a *temporary* building, as the term is used in Restriction 2, is something

other than a permanent building as used in Restriction 3. Yet if a building with tar paper walls was a temporary building, why was it necessary to use the tar paper language in Restriction 3? It could hardly be argued that a building with tar paper walls is more permanent than a building of metal construction.