H. Leo DANIEL and Barbara Daniel,
et al., Plaintiffs–Respondents,

v.

Vernon H. GALLOWAY and P. Audrey
Galloway, Defendants–Appellants.

No. 17979.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 20, 1993.

Motion for Rehearing or Transfer
Denied Sept. 10, 1993.

Application to Transfer Denied
Oct. 26, 1993.

Paul H. Gardner, JoAnn M. Tracy, Husch & Eppenberger, Jefferson City, for defendants-appellants.

Erik A. Bergmanis, Phillips, McElyea, Walker & Carpenter, P.C., Camdenton, for plaintiffs-respondents.

GARRISON, Judge.

Respondents (Plaintiffs), owners of lots in Sunny Slope Subdivision in Camden County, Missouri, filed a Petition For Injunction alleging that appellants (the Galloways) were maintaining a "house trailer" in the subdivision in violation of restrictive covenants. The trial court entered judgment for the Plaintiffs and ordered the removal of the

Galloways' structure within sixty days. The Galloways appeal from that judgment.

The original plat of Sunny Slope Subdivision was filed in 1959 and included the following restrictions:

> No more than one dwelling with one additional building or garage or store room shall be erected on any lot, which said building or buildings shall be placed upon a permanent foundation, with exterior to be of frame, stone, brick, stucco, or asphalt shingles or wooden shingles, but specifically prohibiting imitation siding and paper siding, and if building is of concrete or block construction, the same must be covered with one of the approved finishes. The dwelling must be a minimum of Four Hundred (400) square feet in exterior size excluding garage.... House trailers of a minimum length of Thirty-five (35) feet and completely modern may be placed upon Blocks Seven (7), Eight (8), and Nine (9) only.

In 1961 the same restrictions were incorporated by reference when the second addition to the subdivision was platted. In January 1977, the Galloways purchased two lots in Block 13 of the subdivision's second addition. The deeds conveying the property contained the words "[s]ubject to all restrictions ... of record." In July 1984, the structure, which Plaintiffs contend is a prohibited "house trailer," was purchased by the Galloways, moved onto one of their lots, and assembled.

The structure in question cost $29,121.87 and was constructed and delivered in two sections. Each section had two steel I-beams running from end to end, which provided support during transport but which were primarily for support after it was assembled and installed. The purchase price of the home did not include axles, wheels, or hitches, and those used to transport the sections were removed after installation and retained by the seller. The two sections were joined after being placed ·on a poured concrete perimeter wall in which pockets were left to accept the ends of the I-beams. Concrete footings supported both the perimeter wall as well as concrete blocks which were stacked at various points under the I-beams to provide support. At the time of installation, the structure was also connected to a septic tank, water and electricity.

When assembled, the structure measured 44 × 28 feet and contained approximately 1230 square feet of floor space consisting of three bedrooms, living room, kitchen, two baths, and utility room. It had a pitched roof with asphalt shingles and a gable over the front door and on both ends of the home, wood siding, 2 × 6–inch sidewalls, R–19 insulation, self-storing storm windows, guttering, and central air, in addition to other features. When they ordered the home, the Galloways customized the standard floor plan by altering the breakfast bar and adding an exterior sliding door. After the structure was installed, the Galloways added a front porch with roof, a deck on the back, and landscaping. The undisputed testimony was that the Galloways purchased the structure intending it to be their permanent residence and that they had no intention of moving it after it was placed on the lot. The Galloways argue that it is a permanent structure which is a "manufactured home" and not a "house trailer" prohibited by the restrictions.

The Galloways allege, on this appeal, that the trial court misapplied the law to its own factual findings; the judgment was not supported by substantial evidence and was against the weight of the evidence; and an injunction was not authorized because Plaintiffs failed to meet their burden of proof.

In reviewing court-tried cases we are to sustain the trial court's judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Such cases are reviewed upon both the law and the evidence with due regard given to the trial court's opportunity to judge the credibility of witnesses. Rule 73.-01(c);[1] *Phillips v. Schwartz*, 607 S.W.2d 203, 206 (Mo.App.1980).

Restrictive covenants are not favorites of the law and are to be strictly construed.

---

1. All references to rules are to Missouri Rules of Court, V.A.M.R.

*Schneider v. Forsythe Group, Inc.,* 782 S.W.2d 139, 143 (Mo.App.1989); *Brasher v. Grove,* 551 S.W.2d 302, 303 (Mo.App.1977). A restrictive covenant is not open to judicial construction if it is unambiguous. *Dierberg v. Wills,* 700 S.W.2d 461, 468 (Mo.App.1985). The intent of the parties, as expressed in the plain language of the restrictive covenant, should be given effect by the courts. *Blevins v. Barry–Lawrence County Association for Retarded Citizens,* 707 S.W.2d 407, 408 (Mo. banc 1986). Terms used in restrictive covenants should be applied in accordance with their plain, everyday or popular meaning. *Simcox v. Obertz,* 791 S.W.2d 440, 442 (Mo. App.1990). The language used in the entire instrument should be considered, however, and not just one clause. *Weiss v. Fayant,* 606 S.W.2d 440, 442 (Mo.App.1980); *Pellegrini v. Fournie,* 501 S.W.2d 564, 565 (Mo.App. 1973). Such covenants are to be interpreted narrowly, and in so doing the court must be careful not to go beyond the express stipulations. *St. Louis Union Trust Co. v. Tipton Electric Co.,* 636 S.W.2d 357, 359 (Mo.App. 1982).

Where there is doubt as to the meaning of a restriction, it is proper to consider the parties' situation, together with accompanying circumstances, to determine the intention of the parties. *Berkley v. Conway Partnership,* 708 S.W.2d 225, 227 (Mo.App. 1986); *Phillips v. Schwartz,* 607 S.W.2d at 207. This includes an inquiry into the purpose the parties sought to accomplish by the restrictive covenant. *Phillips v. Schwartz,* 607 S.W.2d at 207; *Hanna v. Nowell,* 330 S.W.2d 595, 599 (Mo.App.1959). The critical time in determining what was intended by the restrictions is at the time the subdivision was platted. *Phillips v. Schwartz,* 607 S.W.2d at 207; *Weber v. Les Petite Academies,* 548 S.W.2d 847, 851 (Mo.App.1976). The burden of proving that the use being made of the property is in violation of the restrictions is on the party seeking to enforce them. *Brasher v. Grove,* 551 S.W.2d at 303–304. The words of the restrictive covenants are not to be extended by implication, and any reasonable doubt as to their meaning is

to be resolved in favor of the free use of land. *Brasher v. Grove,* 551 S.W.2d at 303.

In the instant case, "house trailers" were described in the testimony as the single section units manufactured in the 1950's and 1960's with metal siding, metal roof, crankout windows, a hitch permanently mounted on the front, wheels and axles left in place for movability, and not built pursuant to standardized codes. The trial court found they were built as a means of temporary housing that could be moved.

The design of such structures evolved over the years from expanding the width of singlewide homes in the 1960's and 1970's to the later split or sectional homes, similar to the one in issue here, which the trial court found were built as permanent housing. The evidence was that the company which sold the subject structure to the Galloways had sold 160 such homes, only one of which had been moved after its original installation.

In 1976 the United States Department of Housing and Urban Development adopted a Manufactured Home Construction and Safety Standards Code (the HUD code) setting minimum standards for space dimensions, fire safety, body and frame construction, thermal protection, plumbing systems, and heating, cooling and electrical systems. The testimony in the instant case was that these requirements were so severe that many manufacturers went out of business. The HUD code is required to be followed in Missouri. §§ 700.-010–700.500;[2] 4 CSR 240–120.100. The original version of the statute referred to the structures as mobile homes but was changed in 1982 to describe them as manufactured homes.

In the instant case, the trial court found that the "house trailer of the 1950's and the 1960's is no longer manufactured" and that term is no longer used. Its conclusion that it was justified in considering the surrounding circumstances to determine the intent of the dedicators amounted to a finding that the use of the term "house trailer" in the subject restrictions was ambiguous when applied to the facts in the instant case. The controlling issue in this case became whether the restric-

---

**2.** All references to statutes are to RSMo 1986, V.A.M.S.

tive covenant in question was intended to prohibit structures such as the Galloways'.

■ There was no direct evidence presented to the trial court concerning the intent of the dedicators. The Galloways contend that there was insufficient evidence to establish an intent that the covenants prohibit a structure such as theirs. Plaintiffs argue that "[c]learly the intent of the scrivener who imposed the restrictions in question was to prohibit completely modern house trailers of thirty-five feet and longer which later became known as mobile homes and which are presently known as manufactured homes" and that "it is obvious that had the words 'mobile home' or 'manufactured home' been in existence in 1959, those terms would have been used." We must assume that the restrictions were drafted using the term "house trailer" in the usual and ordinary sense in which it was used in 1959 when the restrictions were originally drafted and in 1961 when they were incorporated into the amended plat of the subdivision. The structures in use at that time were very dissimilar from the one in issue here. In considering the intended scope of restrictions, it is proper to consider whether the phrase under consideration was in use long before the existence of structures sought to be prohibited by the restrictions.[3] *See Phillips v. Schwartz*, 607 S.W.2d at 207.

Some indication of what was meant by the term "house trailers" in the instant restrictions is gleaned from the character of the structures actually placed and permitted to exist in those portions of the subdivision where they were specifically authorized. A photograph introduced in evidence of a home in that section of the subdivision shows a single-wide house trailer with a metal roof, skirting around the bottom, and a hitch still attached to the front. In short, the photographs show that the Galloways' residence is very dissimilar from the "house trailer" permitted in that portion of the subdivision where those structures were specifically authorized.

■ The Galloways' residence is also dissimilar from the descriptions of "house trailers" given by the Plaintiffs in their testimony and answers to interrogatories. Testimony concerning the meaning or intent of restrictive covenants can also come from property owners. *See Phillips v. Schwartz*, 607 S.W.2d at 207; *Feely v. Birenbaum*, 554 S.W.2d 432, 436 (Mo.App.1977).

In the instant case, Plaintiff Leo Daniel testified that he was familiar with the term "house trailer" as used when the subject restrictions were imposed and that "[i]t was a place to live on wheels, that could be moved from place to place." He further testified that the restrictions in question do not refer to the terms "mobile homes" or "manufactured homes" because these terms were not in use at the time the restrictions were adopted; that the construction of what he calls mobile homes has changed substantially since 1959; and that double-wide mobile homes first came into existence in the mid–1960's. His reasons for contending the Galloways' structure is a "house trailer" include the fact that it came in on wheels, it was pulled by a specially designed truck, it had temporary lights for turn signals and brake lights, it had plastic covering the open sections for transport, it had axles and wheels as well as a tongue, and it looked like a trailer house. In addition, he referred to the type of supports it has under it.

Another Plaintiff, Wiley Daniel, gave his opinion that a house trailer was "any structure that is on wheels and has a trailer hitch on front so that it may be pulled," and that house trailers and mobile homes are the same. Other Plaintiffs answered interrogatories by saying a house trailer is pulled by a vehicle and designed to serve as a dwelling wherever parked; a "manufactured home" was "factory assembled, subassemblies that are delivered to building site and erected as permanent structure"; and a mobile home is "a trailer that is used as a permanent dwelling."

---

**3.** The trial court recognized this fact in its Findings of Fact concerning the claims of the Galloways that some Plaintiffs also maintained structures on their properties in violation of the restrictions when it found some of the structures complained of "did not exist at the time when the subdivision restrictions in question were imposed."

Plaintiffs contend that the terms "house trailer" and "mobile home" are synonymous and that the structure in question qualifies as a "mobile home." They argue that *Phillips v. Schwartz*, 607 S.W.2d at 206, held that the term "trailer" means "mobile home." In the *Phillips* case, the issue was not whether mobile homes were prohibited by a restriction against a "trailer or movable house"; rather, the issue was whether the restriction applied to camper trailers. The court, in holding that camper trailers were not prohibited, said that the restriction was intended to apply to mobile homes. Unlike the instant case, however, there was evidence in the *Phillips* case concerning the intent of the developers and purpose of the restrictions.

In the instant case, Plaintiffs introduced a Declaration of Restrictions concerning unrelated property which indicates there is a distinction between a "trailer house" and "mobile home." It provides:

> ... No house trailer, travel trailer, mobile home (including double or triple wide variety), or any other type of dwelling or home which does not come within the provisions of II A above, ... shall be placed or erected on any lot....[4]

Missouri courts have recognized that the size, design and appearance of mobile homes have been greatly improved over the trailers and mobile homes of the not-too-distant past and that they have taken on an increasingly important role in providing housing. *Holtmeyer v. Roseman*, 731 S.W.2d 484, 486 (Mo. App.1987). They have also recognized that terms such as "trailer" may be ambiguous when applied to a specific circumstance because of the social and scientific changes. *Phillips v. Schwartz*, 607 S.W.2d at 206–207.

A theme which seems to underlie Plaintiffs' position involves the issue of mobility of the structure in question. They contend that the structure is a house trailer in violation of the restrictions because it was moved to the site on wheels; could again be moved by attaching a hitch, wheels and axle; is not bolted or permanently attached to the concrete perimeter wall; and still has the steel I-beams in place. Obviously, house trailers in existence in 1959 when these covenants were adopted often remained highly mobile by retaining their axles, wheels, tires and hitches. The structure in the instant case has not retained the ease of mobility enjoyed by house trailers of the 1950's. The purchaser did not obtain axles, wheels, tires or hitches with these two units, but rather they were removed and retained by the seller upon delivery and erection of the sections of the home. The uncontroverted evidence was that it is extremely rare for these homes to be moved after being originally installed. Moving a 1950's-era trailer house involved little more than removing any skirt and supporting blocks and hooking a vehicle to the hitch. In comparison, moving the structure in question here would involve separating the sections, removing the deck and front porch, locating and installing replacement axles and wheels, obtaining and welding a hitch onto the frame, removing the perimeter wall, and covering the exposed open sections during travel. The fact that it is *possible* to move the subject structure is, in our view, not determinative of whether it is a "trailer house" within the intent of these restrictions. *See Brasher v. Grove*, 551 S.W.2d at 306.

The trial court found that "[i]n looking at the documents as a whole, it appears that the intent of the dedicators was to insure that conventional type housing was on all the lots in the subdivision except for Block 7, 8 and 9 which allowed 'house trailers'." There is no indication what the trial court relied on in reaching that conclusion other than the restrictions themselves which do not contain the word "conventional."

There was no evidence that the quality or type of materials and workmanship required by the HUD code to be used in structures such as the one in issue here would be less than contemplated in a "conventional" structure in 1959. Likewise, there was no evidence introduced concerning the life expectancy of the Galloways' structure or whether it would reasonably be expected to deteriorate any faster than "conventional" housing. *See Brasher v. Grove*, 551 S.W.2d at 306.

---

4. Plaintiffs do not argue that failure of the restrictions in the instant case to include the term "placed" in addition to "erected" is of any significance in the consideration of this case.

Plaintiffs' contentions at trial that the structure in question was not bolted to the concrete perimeter wall or the concrete block supports loses significance in light of the requirement in the restrictions that the dwelling only "be placed" upon a permanent foundation. An interpretation that the restrictions were intended to require "conventional" housing was also contradicted by evidence that a "prefabricated" house existed in the same section of the subdivision as the Galloways' structure.

The use of the term "erected" in the restrictions does not require a conclusion that the structure in the instant case is prohibited. "Erect" is defined as "to put up . . . by the fitting together of materials or parts; cause to stand ready for use"; "build"; "to hoist and bolt in place fabricated parts"; "to fix in an upright position"; "put up"; "to cause to stand up or out." *Webster's Third New International Dictionary, Unabridged* 770 (1976). None of such definitions would necessarily exclude pouring the footings and concrete perimeter wall in preparation for the Galloways' structure; the work and materials necessary to join the two sections of the structure and conceal the joints; the removal of the axle, wheels and trailer hitch; or the addition of the front porch and rear deck.

In short, the restrictions themselves do not, unambiguously, establish that the purpose was to prohibit structures such as the one in issue here and to require "conventional" housing. If, as found by the trial court, the intent of the dedicators was to ensure that conventional type housing was on all of the lots in the subdivision except those on which house trailers were specifically authorized, it could easily have been accomplished in the wording of the restriction. The same

is true if the ease of mobility, or lack thereof, was significant in determining whether a particular structure was prohibited as a house trailer.[5] The restrictive covenant in question is another example of imprecise draftsmanship which the court recognized in *Holtmeyer v. Roseman*, 731 S.W.2d at 486.

Plaintiffs argue that *Brownfield Subdivision, Inc. v. McKee*, 61 Ill.2d 168, 334 N.E.2d 131 (1975), stands for the majority view that "once a trailer, always a trailer" and that it should be applied in the instant case. In that case the issue was whether a structure similar to the Galloways' was prohibited by a restriction against a "structure of a temporary character, trailer . . . ." The court held that, in accordance with the majority view, removing the wheels of a mobile home and placing it on a permanent foundation did not convert it to a permanent structure. In *Brownfield*, however, there was no discussion concerning the purpose of the restriction or the effect of an ambiguity on its interpretation and application. In addition, Missouri courts have reached a different result in applying the same restriction as that involved in the *Brownfield* case. *See Holtmeyer v. Roseman, supra*, which considered the same restriction as in *Brownfield* but held that a mobile home placed on concrete piers without its wheels and axles was not prohibited. Unlike the *Brownfield* case, the court in *Holtmeyer* discussed the effect of ambiguities in the construction of restrictions under Missouri law and held that those which are not clearly and precisely stated will be strictly construed against those seeking to enforce them, saying:

If respondents had intended to exclude the construction of all homes except those constructed in a particular manner, size, shape and cost, the restriction should have

---

**5.** See *Shepard's Mobile Homes and Mobile Home Parks* (1975 ed.), § 8.12, at page 152, for the following suggested restrictive covenant:

No building except a private dwelling house shall be erected or permitted on the conveyed premises or any part thereof. No trailer or mobile home (regardless of its lack of mobility), tent, shack, stable, or barn shall be placed thereon except a shack, stable, or barn used as a necessary outbuilding, nor shall any structure of a temporary character be used at any time as a residence. The intent of this cove-

nant is to restrict the use of the property to a private dwelling of a conventional nature, and to exclude all other structures except necessary outbuildings, whether or not permanently affixed to the land. This covenant shall not exclude prefabricated or modular homes of a conventional type, though not constructed on the premises.

See also the Declaration of Restrictions which applies to unrelated property introduced by Plaintiffs and discussed earlier in this opinion.

been specifically phrased so as to eliminate any ambiguity as to the type of construction not acceptable.

*Id.* at 487.

Other courts have refused to construe the term "house trailers" in restrictive covenants as prohibiting structures similar to that in question here. *See Fischer v. Driesen,* 446 N.W.2d 84 (Iowa App.1989); *North Cherokee Village Membership v. Murphy,* 71 Mich. App. 592, 248 N.W.2d 629 (1976); *Crawford v. Boyd,* 453 S.W.2d 232 (Tex.Civ.App.1970). *See also Kinchen v. Layton,* 457 So.2d 343 (Miss.1984). In the *North Cherokee Village* case, the court said:

> ... this Court is asked to engage in semantic sleight of hand by declaring a two piece mobile home, bereft of its chassis and securely joined together, to be a house trailer. We decline the invitation.

*Id.* 248 N.W.2d at 632.

Restrictive covenants are not to be extended by implication to include anything not clearly expressed in them. *Vinyard v. St. Louis County,* 399 S.W.2d 99, 105 (Mo. 1966). Under the facts and circumstances of this particular case, we are unable to say there was no ambiguity or substantial doubt as to whether these restrictive covenants were intended to apply to a structure such as the Galloways'. Accordingly, they are to be read narrowly and such doubt is to be resolved in favor of the free or less restrictive use of the land. *Steve Vogli & Co. v. Lane,* 405 S.W.2d 885, 889 (Mo.1966); *Phillips v. Schwartz,* 607 S.W.2d at 209; *Brasher v. Grove,* 551 S.W.2d at 303.

The Judgment entered in this case is reversed.

MONTGOMERY, P.J., and FLANIGAN, J., concur.