Samuel P. CANIGLIA and Joseph A. Longo, Plaintiffs,

v.

NIGRO CORPORATION, a Corporation, Defendant-Respondent,

Rock Springs Realty, Inc., a Corporation, Defendant-Appellant,

The Firestone Tire & Rubber Company, a Corporation, and T. G. & Y. Stores Company, a Corporation, Interveners-Respondents.

No. 53352.

Supreme Court of Missouri, Division No. 1.

May 12, 1969.

James P. Tierney, Kemp, Koontz, Clagett & Nordquist, Kansas City, for appellant.

Martin J. Purcell, Donald B. Steele, Allan W. Stopperan, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for respondent Nigro Corp.

William H. Sanders, Larry L. McMullen, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for intervenor-respondent The Firestone Tire & Rubber Co.

HENLEY, Presiding Judge.

Action for a declaratory judgment seeking relief from a contract entered into by the owners of two adjoining tracts of land on each of which a shopping center is constructed. On August 13, 1963, respondent Nigro Corporation (hereinafter Nigro), owner of a tract of land south of and fronting on 75th street in Kansas City, Missouri, entered into a contract (hereinafter Parking Agreement or Agreement) with appellant Rock Springs Realty, Inc., (hereinafter Rock Springs), owner of a tract of land adjoining Nigro's tract on the south side. The Agreement (set out in full in the appendix) provides, in general, that the customers of the tenants of each owner shall have unrestricted use of all parking facilities on both tracts and that neither owner shall install nor maintain any barriers or obstructions to the free movement of vehicular and pedestrian traffic or to clear visibility between buildings and the parking areas. The tenants of Nigro are Katz Drug Company (hereinafter Katz) and The Great Atlantic & Pacific Tea Company (hereinafter A & P). The principal tenants of Rock Springs are the Firestone Tire & Rubber Company (hereinafter Firestone) and T. G. & Y. Stores Company (hereinafter TG&Y).

On October 30, 1965, plaintiffs, Caniglia and Longo, and appellant, Rock Springs, entered into a real estate sales contract wherein plaintiffs agreed to purchase the Rock Springs' property conditioned upon the purchasers obtaining a judicial determination that the Parking Agreement between Rock Springs and Nigro is either void, cancellable at will by Rock Springs, or not binding upon the latter's purchasers. Thereafter, plaintiffs instituted this action naming Nigro and Rock Springs as parties defendant. By an amended petition filed November 1, 1966, plaintiffs alleged, in substance: (1) that the Parking Agreement is void and therefore not binding on Rock Springs or plaintiffs, because it was without consideration given by Nigro in that before the date of its execution Nigro had by lease demised to Katz and A & P all right of control and possession it had over its tract, including all the parking area; (2) that the Agreement, if valid, is not binding on plaintiffs and is terminable at will, because it creates no more than a license or personal contract between the parties thereto and does not rise to the dignity of an encumbrance on the land in the nature of an easement or restrictive covenant.

Rock Springs filed an answer, and a cross petition in five alternative counts against its codefendant Nigro. Its answer admits execution of the Agreement and the first above-related allegation of plaintiffs' petition; otherwise, it denies generally all other allegations inconsistent with its cross petition. Rock Springs' cross petition alleges in substance: (1) that the Agreement is void for the further reason that neither Katz nor A & P had subordinated their lease rights in the whole Nigro tract to the Agreement; (2) that the Agreement, if valid, was voidable, because Nigro, and an attorney who prepared it for both Rock Springs and Nigro, falsely represented, and Rock Springs believed and relied on the representation, that Nigro had sole control over and possession of the parking area on its property and could enter into an agreement that would give Rock Springs immediate enforceable rights in Nigro's tract, but that Nigro failed to so bind its property; and that immediately upon learning the true facts Rock Springs rescinded the Agreement by letter to Nigro. Rock Springs further alleged, in substance, that if the Agreement is valid, is not rescindable and has not been rescinded, the Agreement should be reformed to comply with a paragraph (hereinafter referred to) in its lease with Firestone, because the attorney representing Nigro and Rock Springs represented to Rock Springs, and it relied thereon, that the Agreement

was identical with the requirements of that lease, whereas it was not identical. Rock Springs also alleged, in substance, that the Agreement, if valid and not rescinded, should be construed to permit it to (1) erect another building or buildings on its land, (2) establish rules and regulations for parking on its land, and (3) erect and maintain certain "bumper blocks" on its land for safety and traffic regulation purposes; that to so construe the Agreement would be in violation of its terms, but that Nigro contends otherwise despite the fact that both parties to the Agreement have since its execution erected additional buildings and have controlled parking and traffic flow by means of painted lines on the parking surface and by signs. In another alternative count Rock Springs alleges, in substance, that if by its terms the Agreement may not be so construed, then the same should be reformed to so provide, because it was agreed between the parties before execution of the Agreement that Rock Springs could erect another building or buildings and regulate and control parking and traffic and the Agreement failed to so provide, because of mutual mistake of the parties and their attorney or fraud practiced on it by Nigro.

Nigro filed answer to Rock Springs' cross petition, and a cross petition for injunctive relief. Its answer denies generally the allegations of Rock Springs' cross petition and further alleges, in substance: (1) that no buildings have been constructed on the lands of either party which were not contemplated by the Parking Agreement and another contract dated August 13, 1963, between these parties hereinafter referred to as the Katz Expansion Agreement; (2) that the exact location of the Firestone and TG&Y building on the south and east lines of Rock Springs' tract was known and agreed to by the parties and it was contemplated that that building would contain other tenants, as it does, but that it was further understood by the parties, and the Agreement reflects, that no additional buildings were to be constructed; (3) that it has not controlled parking and traffic

flow other than by painted lines on the parking surface; and (4) that parking or "bumper blocks" and signs installed by Rock Springs have improperly interfered with and controlled the parking and flow of traffic between the two properties. Nigro's cross petition for injunction alleges, in substance, that it has been informed by Rock Springs, and believes, that it intends to and will build additional buildings for office and retail purposes and a postal unit on that part of its tract now used for parking spaces which will not only decrease the amount of parking space available but will obstruct visibility and the flow of traffic between the two properties in violation of the Parking Agreement; that construction of such buildings would impair, and the present threat thereof has impaired, Nigro's relations with its tenant, Katz, which has entered into a new lease with Nigro in reliance on the Agreement.

Firestone and TG&Y, tenants of Rock Springs, were permitted to intervene as parties defendant and filed separate answers in which they take positions opposite that of their landlord and supporting that of Nigro. Firestone also filed a cross petition for declaratory relief that the Agreement grants valid and enforceable cross-easements binding upon both Nigro and Rock Springs which prohibits the erection of additional buildings on the existing parking area. It alleges, in substance, that by the terms of a lease between them Rock Springs agreed that it would obtain the Parking Agreement from Nigro and that it (Rock Springs) agreed that it would not construct buildings on the area designated for parking, would not violate any of the Agreement's provisions and would take all steps within its power to keep it in full force and effect; that Rock Springs now seeks to rescind the Agreement, but that by reason of these facts it is estopped from doing so.

The court made findings of fact and conclusions of law and entered judgment in favor of Nigro and Firestone and against plaintiffs and Rock Springs on all issues.

By its judgment the court also enjoined permanently Rock Springs from erecting any buildings or structure of any type on its property, other than the present buildings. Plaintiffs did not appeal; Rock Springs did. Thus, the issues on this appeal are between Rock Springs, as appellant, and Nigro, Firestone and TG&Y, as respondents.

In this court-tried action we review the case upon both the law and the evidence as in suits of an equitable nature; determine the weight and value of the evidence, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses; and, we make our own findings and reach our own decision on the merits, having in mind that we may not set aside the judgment unless it is clearly erroneous. Civil Rule 73.01(d), V.A.M.R.

We find the facts to be as follows: Nigro acquired what is now its property in 1941, 1948, 1956 and May, 1962, in four separate but contiguous tracts. As one tract, it fronts on and lies south of 75th street; its western boundary is a 42′ north-south strip of land lying between it and Wornall road; part of its eastern boundary is Wyandotte street. Nigro constructed a building in the northwest corner of its property and in 1948 leased it and adjoining parking space to Katz for a 20 year term. A "Declaration of Lease" describing both the building and the parking space was recorded December 15, 1948. Thereafter Nigro constructed a building south and east of the property leased to Katz, and leased this building and the balance of its land to A. & P. for a term of 10 years beginning December 8, 1962, with two renewal options of five years each. This lease, describing both the building and parking space, was recorded July 25, 1962.

On December 26, 1962, Rock Springs acquired a tract of land south of and adjoining the Nigro tract. At the same time, Rock Springs acquired the 42′ wide strip of land (adjoining the Nigro tract on the west side) which led from 75th street south to the main body of Rock Springs' tract. The main bodies of the Nigro and Rock Springs' properties were physically separated at their common east-west boundary line by a low curbing and a wall which prevented automobile and other traffic from passing freely from one to the other. The only access to the main body of the Rock Springs' property from 75th street was south on this 42′ wide strip, and from Wornall road east on an unimproved road across the right of way of the Kansas City and Westport Railway Company. Beginning shortly after Rock Springs acquired its property, and for some time thereafter, the Railway right of way and the 42′ wide north-south strip owned by Rock Springs were threatened with condemnation by Kansas City for road use for what was to be known as the Country Club Expressway. This action would have caused the main body of the Rock Springs' property to be, for all practical purposes, landlocked.

In these circumstances Rock Springs began negotiations with Firestone and TG&Y looking toward leasing to them parts of a building it planned to construct in the southeast corner of its property facing north and west toward the Nigro property. In February, 1963, Rock Springs entered into a lease with TG&Y for a part of its building for an undisclosed term (so far as the record shows), beginning May 1, 1964. On June 28, 1963, Rock Springs entered into a lease with Firestone for a part of the building to be constructed for a term of fifteen years with three five-year options. The term of this lease commenced June 1, 1964, and the third five-year option, if exercised by the tenant, would expire May 31, 1994. Paragraph 46 of the Firestone lease required Rock Springs to enter into an agreement with Nigro which would provide " * * * that neither party [Nigro or Rock Springs] shall install or maintain any barriers or obstructions to the free movement of vehicular and pedestrian traffic and visibility between the two properties." This paragraph further provided that the duration of that agreement " * * * shall be at

least as long as the term of [the Firestone] lease plus the renewal options * * *"; that the agreement be recorded and " * * * run with the land"; and that Firestone could cancel the lease, at its option, if at any time obstructions to the free flow of traffic or visibility are placed between the two properties.

During the period Rock Springs was negotiating with Firestone and TG&Y, Dick Nigro, managing officer of Rock Springs, contacted his aunt, Evelyn Nigro, managing officer of Nigro, and requested permission to remove the curbing and wall on the line separating the properties and for ingress and egress across the Nigro property to 75th street and to Wyandotte street for his tenants and their customers so that he could comply with paragraph 46 of the proposed Firestone lease. He also suggested to his aunt that the two corporations enter into a written agreement providing for this ingress and egress and that the agreement further provide that the tenants of each corporation and the tenants' customers be permitted to use the parking areas on both properties and for that purpose freely to cross from one property to the other. Mrs. Nigro agreed that this was a good idea, but stated that her company was in no position to enter into such an agreement without the permission of its tenants, because their leases included all the open space used for parking. She also reminded him that he knew she had been negotiating for some time with Katz who wanted her to enlarge its building and that if Nigro and Rock Springs were eventually to agree on the cross-parking proposition and ingress and egress for Rock Springs over the Nigro property such agreement would have to contain a provision that such action would not prevent Nigro from expanding the Katz building. Dick Nigro agreed that such agreement as they might enter into would not prevent expansion of the Katz building. Dick Nigro was persistent in his requests for such an agreement, making several trips to Mrs. Nigro's home to discuss it. Evelyn Nigro secured tentative oral ap-

proval from her tenants for removal of the barriers between the two properties and authorized Dick Nigro to negotiate direct with both Katz and A & P to arrange for actual removal. He negotiated with Nigro's tenants, the barriers were removed, and Rock Springs directly compensated A & P for the wall removed from its leased property.

Rock Springs, through Dick Nigro, retained Charles Shafer, an attorney, to prepare an agreement to be executed by Nigro and Rock Springs which would: (1) meet the requirements of paragraph 46 of the Firestone lease; (2) provide for mutual rights of ingress and egress and parking rights on both tracts for the tenants of both and their customers; and (3) provide that the agreement would not prevent Nigro from expanding the Katz building. Mr. Shafer prepared the agreement and submitted it to Rock Springs and Nigro. The first draft limited the term of the agreement to fifteen years. Dick Nigro objected to two parts of this draft: (1) its term was not long enough to meet Firestone's requirements that its life be as long as the lease including the three five-year options; and (2) inclusion of the provision for expansion of the Katz building. He requested that it be changed to meet Firestone's requirements, and, that provision for expansion of the Katz building be embodied in a separate agreement. Mrs. Nigro had no objection to these requests. It was accordingly redrafted; the Katz expansion provision was embodied in a separate agreement, and both agreements were submitted first to Nigro. They were executed by Nigro on August 13, 1963, and delivered to Dick Nigro for execution by Rock Springs. Rock Springs executed both agreements, but delivered only the Parking Agreement to Nigro. Dick Nigro declined to deliver the Katz Expansion Agreement to Nigro, marked it "void" across its face, and kept it in his personal file, because (he said) he was afraid it would adversely affect his financing of the proposed improvements on Rock Springs' land and the latter's relations

with Firestone. Rock Springs delivered a copy of the executed Parking Agreement to Firestone which accepted it as complying with paragraph 46 of its lease. Beginning in the Winter of 1963, and extending through the Spring of 1964, Evelyn Nigro repeatedly asked Dick Nigro, and other officers of Rock Springs, for delivery of the executed Katz Expansion Agreement so that Nigro could complete its negotiations with Katz for expansion of its building. These requests were refused. In May, 1964, the month Firestone and TG&Y began occupancy of the Rock Springs' building, Nigro threatened to institute suit against Rock Springs to rescind the Parking Agreement on the ground of fraud of Rock Springs in failing to deliver the executed Katz Expansion Agreement. As a result of this threat, Rock Springs and Firestone entered into an additional agreement providing, inter alia, that Firestone would not cancel its lease with Rock Springs should Nigro erect barriers or obstructions to traffic or visibility on the line between the properties if Rock Springs would not violate any of the provisions of the Parking Agreement and would take all legal steps within its power to enforce the agreement, including appeals to the State Supreme Court. In June, 1964, Nigro filed suit against Rock Springs to rescind the Parking Agreement. In February, 1965, that suit was settled by Rock Springs executing another agreement authorizing Nigro to enlarge or rebuild its Katz building, the wording of the agreement being substantially the same as the August 13, 1963, Katz Expansion Agreement which Rock Springs had previously refused to deliver along with the Parking Agreement. In June, 1965, Nigro completed its negotiations with Katz and the two entered into a new lease for a term of twenty years with options for renewal for two five-year periods; this lease recognized the Parking Agreement and subordinated Katz' rights to the rights of Nigro and Rock Springs, their respective tenants and the latter's customers. This lease called for the construction of a new and larger building for Katz as contemplated by the Expansion Agreement; the building was completed and Katz began occupancy on November 15, 1965. In the course of construction of this building the grade of a portion of the Nigro property along a part of the boundary line between Nigro and Rock Springs was, contrary to Nigro's plans and specifications, lowered two or three feet below the grade of the Rock Springs' property, creating what is referred to as a "hump" or a "drop-off" hazardous to automobiles and which resulted in restricting the locations where they could move from one tract to the other. This "hump" or drop-off" constitutes a barrier to the free movement of vehicular traffic between the two properties.

Nigro offered to remove this "hump" or "drop-off" and restore that area to its previous condition at its expense. The method proposed to accomplish this was to cut into the Rock Springs' tract adjacent to the line and gradually lower the level of a part of its parking area so that the grade would "feather-out" south of the line. Nigro requested permission for temporary use of a part of Rock Springs' land for this purpose. Permission was refused and at the time of trial in November, 1966, the "hump" and certain parking blocks hereinafter mentioned were still there.

Sometime after construction of the new Katz building Rock Springs rearranged the parking pattern on its land by changing the location and direction of lines painted on the paved surface, and by the installation of concrete parking blocks of the type seen in the parking area of many shopping centers. Some of these blocks were installed adjacent to the "hump" or "drop-off", obviously for safety purposes, but the record is not clear as to how many or where others were located. Insofar as we are able to determine from this record these parking blocks do not constitute a barrier or obstruction to the free movement of vehicular and pedestrian traffic between the properties and the buildings

on each tract, and are of such size they could not obstruct visibility.

On October 21, 1966, after this suit was filed, Nigro and A & P executed a contract effective as of August 13, 1963, filed for record, wherein it was recited that A & P was informed of and had acted in conformity with the Parking Agreement since its execution and that it continued to agree to be bound by its terms. By this contract A & P formally subordinated its lease rights to the Parking Agreement.

On October 18, 1966, after this suit was filed Rock Springs wrote a letter to Nigro attempting to rescind the Parking Agreement on essentially the same grounds as those stated in its cross petition.

Rock Springs, or its transferees, propose to construct a building containing 6,200 square feet adjoining the boundary line between the two properties on an area used for parking and at a point that would be about the center of the combined properties. The building described clearly would occupy a significant amount of the existing common parking area and would be a barrier and obstruction to the free movement of vehicular and pedestrian traffic and to clear visibility between the buildings on each tract.

At the time of the execution of the Parking Agreement Rock Springs had actual knowledge of the fact that Nigro had leased all of its tract, including the parking area, to Katz and A & P. At all times since execution of the Parking Agreement both Rock Springs and Nigro and their respective tenants have recognized and accepted the rights and benefits of, and fully complied with, the Parking Agreement. Neither has complained to the other that the other's tenants or the latter's customers have violated any of the terms of the Agreement. As stated, Rock Springs attempted to rescind the Agreement but we note that since that date Rock Springs and its tenants have continued to make use of the Nigro property for ingress and egress and parking.

Rock Springs contends in its first point on appeal that the court erred in holding that the Parking Agreement is a valid contract, because " * * * there was no meeting of the minds [of the parties]; or, more specifically, that Rock Springs did not get what it reasonably thought, and was led to believe, it was receiving in the [Agreement]." It says it thought it was getting, and the Agreement purports to, but did not, give it a "presently enforceable" easement in all that part of Nigro's land not then occupied by the Katz and A & P buildings; that it did not get an easement that was "presently enforceable," because Nigro could not give it for the reasons all of the latter's parking area had been leased to Katz and A & P and these tenants did not in writing immediately subordinate their rights to the Agreement. Rock Springs argues that all it got by the Parking Agreement was a mere license terminable at will by Katz or A & P; not an easement. In support of its contentions it relies upon and refers to general rules stated in the authorities in footnote 1[1] relating to easements, licenses and restrictive covenants. These authorities have no particular application to the facts of this case.

There is no dispute about the fact that all Nigro's land, including the parking area,

---

1. McLaughlin v. Nieger, Mo.App., 286 S.W.2d 380; Johnson v. Simpson Oil Co., Mo.App., 394 S.W.2d 91; Wood v. Gregory, Mo., 155 S.W.2d 168, 171, 138 A.L.R. 142; First Trust Co. v. Downs, Mo.App., 230 S.W.2d 770, 775; Restatement of Property, § 522(1); Frederich v. Union Elec. Light & Power Co., 336 Mo. 1038, 82 S.W.2d 79, 86; Stone v. Stone, Mo., 176 S.W.2d 464, 468; Liddell v. Lee, Mo., 159 S.W.2d 769, 772; State ex rel. Adler v. Douglas, 339 Mo. 187, 95 S.W.2d 1179, 1180; Metropolitan Paving Co. v. Brown-Crummer Inv. Co., 309 Mo. 638, 274 S.W. 815; McAdams v. Cates, 24 Mo. 223; Employers' Indemnity Corp. v. Garrett, 327 Mo. 874, 38 S.W.2d 1049, 1054; Nordyke & Marmon Co. v. Kehlor, 155 Mo. 643, 56 S.W. 287; Russell v. Empire Storage & Ice Co., 332 Mo. 707, 59 S.W.2d 1061, 1069; Restatement of Contracts, § 472.

was under lease to Katz and A & P at the time the Parking Agreement was executed. Nor is it disputed that Katz and A & P did not execute subordination agreements immediately. But it is clear from this record that Rock Springs, through Dick Nigro, knew and understood that Nigro's parking area was under lease to its tenants and that the interest Rock Springs would acquire in Nigro's land by the Agreement would be subject to the rights of the latter's tenants unless and until the tenants subordinated their rights to the Agreement. In other words, Rock Springs knew it could not *immediately* enforce the Parking Agreement as against Katz and A & P; it knew it had to wait until subordination agreements were executed or until those leases expired. There is no merit in Rock Springs' contention that it did not get what it thought it was to receive by the Parking Agreement. We are inclined to the view that because Rock Springs believed that its land was about to be landlocked, because it had to comply with the requirements of Firestone to secure and keep Firestone as its tenant, and because of the many obvious advantages that would accrue to it by removing the curbing and wall and opening up the two properties so that they would in fact be one large open shopping center, it was willing and anxious to join with Nigro in an agreement that would restrict the use of their respective tracts and burden each with easements for ingress and egress and mutual parking rights for their respective tenants, subject to the known rights of Katz and A & P, but trusting that because of obvious advantages to the latter they would formally subordinate or, at least, immediately acquiesce in and abide by the terms of the Parking Agreement. Katz and A & P immediately acquiesced in and have continued to abide by the Agreement as a result of which Rock Springs has in fact had from the beginning the benefit of all it sought. Furthermore, these Nigro tenants have formally subordinated their lease rights to the Agreement.

The Parking Agreement clearly evinced an intention to burden Rock Springs' and Nigro's properties with easements and restrictions on use binding on them immediately and binding on Nigro's tenants in the future, that is, when and as they separately subordinated their rights to the Agreement. We hold that the Agreement did create mutual easements in and restrictions on the use of the respective tracts for the benefit of and, therefore, binding upon the parties and their respective properties; and, that it is now binding upon Nigro's tenants. Rosenbloom v. Grossman, Mo., 351 S.W.2d 735, 740 [10].

Rock Springs contends in its second point that the court erred in holding that there had not been a substantial breach of the Parking Agreement by Nigro justifying rescission by Rock Springs. Rock Springs argues that it was implicit in the Parking Agreement that Nigro would promptly cause Katz and A & P to subordinate their leases to the Agreement and because of their failure to do so there was a substantial failure of consideration justifying rescission; that it rescinded the Agreement by letter to Nigro dated October 18, 1966, as soon as it learned that Nigro's property leased to Katz and A & P had not been subjected to the Agreement by subordination agreements executed by these tenants.

As stated, Rock Springs knew long before execution of the Parking Agreement that Nigro's property, including the parking area, was leased to its tenants and it may not now be heard to say it did not have such knowledge until October, 1966. While the Parking Agreement did not specifically require Nigro to do so, it may have been implicit in the Agreement that Nigro would try to secure subordination agreements from its tenants, but this is not to say it was implicit that Nigro " * * * *promptly cause* Katz and A & P to subordinate * * *." (Emphasis supplied.) We infer from this record that

if Rock Springs had intended and was relying on Nigro to secure formal subordination agreements from its tenants and if time were of the essence, Dick Nigro would have required that the Parking Agreement say so. The facts and circumstances shown by this record lead us to believe that Rock Springs was not so relying and that time was not of the essence until it entered into the sale contract with plaintiffs. That Nigro did secure subordination agreements from its tenants is witnessed by its new lease with Katz in June, 1965, and its contract with A & P executed in October, 1966.

■ We hold that the Parking Agreement was supported by consideration, Rosenbloom v. Grossman, supra, 1. c. 738 [6] ;[2] and, in the circumstances stated above, that there was no failure of consideration resulting in a substantial breach justifying rescission of the Agreement by Rock Springs, Rock Springs has accepted and enjoyed, and has, through the trial of this case and contrary to its alleged rescission, continued to accept and enjoy to its benefit (and for the benefit of its tenants), all rights to the use of Nigro's tract granted by the Parking Agreement.

Rock Springs contends also that the "hump" or "drop-off" resulting from the erection of the new Katz building, admittedly a barrier to the free movement of vehicular traffic between the properties, constitutes a breach of the Parking Agreement. More about this and another alleged breach in our discussion of the third and last point briefed by Rock Springs.

We quote Rock Springs' third point: "The trial court erred in construing the Agreement: (A) to preclude Rock Springs from erecting any structure on its property while permitting Nigro Corporation to put a separate pylon sign structure on its land; (B) to be of 'perpetual' duration; (C) to preclude Rock Springs from arranging parking on its land with parking blocks as well as lines, while permitting (1) Nigro Corporation's tenants to restrict parking to its customers only and (2) permitting Nigro Corporation to put in a hump preventing passage of traffic between the properties."

■ In considering this point, we bear in mind that the law favors the free and unrestricted use of real property; that restrictions are regarded unfavorably and are to be strictly construed; and, when there is substantial doubt as to the meaning of the wording in any restriction, the doubt should be resolved in favor of the free use of the property. Steve Vogli & Co. v. Lane, et al., Mo., 405 S.W.2d 885, 889 [4–6]. Notwithstanding these rules, it is equally true in the interpretation of restrictive covenants that greater regard is to be given to the clear intention of the parties than to the words used in attempting to express that intention; that the Agreement should be given a reasonable and natural construction, one that the parties would, as reasonable men, be likely to make, rather than a useless contract resulting in no good to either party. The cardinal rule permeating the entire field of construction is, of course, that the court ascertain the intention of the parties and then give effect to that intent, unless it conflicts with some positive rule of law. Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415, 419–420 [7–10].

At the time of the execution of the Parking Agreement the parties knew the location of the A & P and Katz buildings and the size and shape of and location where the Rock Springs' building was to be constructed. With this knowledge they also knew the location and total amount of space left available for parking and the movement of vehicles. Considering the location, shape and size of the existing buildings on Nigro's tract and that to be constructed on Rock Springs' tract as well as that of the new building later constructed for Katz, and considering the testimony of the witnesses,

2. See also: Ragan v. Schreffler, Mo., 306 S.W.2d 494, 499; 1 Williston on Contracts, pp. 395–396, § 103 (3rd Ed.).

it is clear to us that it was the purpose and intent of the parties to create what would appear to be one large shopping center with ample open space available solely for customer use which would afford unobstructed visibility from any one of the buildings to all others and movement of customers and their vehicles from any one parking spot to all others unrestricted except to the extent reasonably necessary for the efficient and safe use of this space for parking and traffic flow. It is obvious that construction of a building on the location proposed by Rock Springs would occupy a significant part of the available parking area and would restrict the movement of traffic and obstruct visibility contrary to the terms of the Parking Agreement and Rock Springs' agreement with Firestone.

■ We hold that the construction of a building on any part of the area of these two tracts used since the erection of existing buildings for parking, movement of vehicular and pedestrian traffic, and for ingress and egress would constitute a violation of the Parking Agreement and should be prohibited for such time as the parties intended. We further hold that the parties intended to, and did by the Agreement, create mutual easements and restrictions on use of their separate tracts running with the land for the length of the term, plus renewal options exercised or hereafter exercised, provided by the present lease of either Firestone, TG&Y, A & P or Katz which would extend the life of the Agreement for the full term of the longest lease; that the easements and restrictions on use are not of perpetual duration. Gardner v. Maffitt, 335 Mo. 959, 74 S.W.2d 604, 607 [6], 95 A.L.R. 452; Duncan v. Academy of the Sisters of the Sacred Heart, Mo., 350 S.W.2d 814, 819 [7]. The trial court erred in permanently enjoining Rock Springs from constructing the proposed building. Its injunction should be limited to the period of time above stated.

■ We also hold the view, and Nigro admits in argument, that the existence of the "hump" or "drop-off" created during the construction of the new Katz building is a barrier to and prevents the free movement of vehicular traffic between the two properties. It is therefore contrary to the intent of the parties and the terms of the Parking Agreement, and should be removed. However, under all the facts and circumstances of this case, we do not consider its creation, nor its existence before or after Nigro offered to remove it, a substantial breach of the Agreement justifying rescission by Rock Springs. The record shows that Nigro offered to remove the "hump" at its expense if Rock Springs would permit the use of a few feet of its land for that purpose, and counsel for Nigro stated in oral argument that his client is still prepared to do so. Since it was Nigro's construction that resulted in the creation of this barrier equity would require its removal and require that it make use of its own property for that purpose rather than property of Rock Springs. Accordingly, the trial court shall by its new judgment order Nigro to forthwith remove the "hump" or "drop-off" at its expense by use of its land area only.

■ The parking blocks installed by Rock Springs are in common usage, apparently for safety purposes and for the efficient use, regulation and control of parking areas; they obviously occupy little, if any, more parking space than lines painted on the surface. In this case some of these blocks were used to prevent automobiles using Rock Springs' tract from dropping off to the lower level of the Nigro tract. In accordance with our finding that these blocks do not constitute a barrier or obstruction to the free movement of vehicular traffic, we hold that their installation and maintenance is not a violation of the Parking Agreement and that the judgment of the trial court ordering that they be removed is clearly erroneous.

There is little to be said for or about Rock Springs' contentions in its last point that the trial court was inconsistent in permitting: (1) Nigro to put a separate pylon

sign on its property; and, (2) Nigro's tenants to restrict parking to their customers. The pylon sign structure on Nigro's land is a large sign erected by or for Katz in the northwest corner of the Nigro tract. There is no substantial evidence that this sign (not located between the buildings) is a barrier or obstruction to the free movement of traffic; in fact, the evidence is to the contrary. It occupies an insignificant part of the area formerly occupied by the first Katz building and, therefore, does not reduce the parking area from that available when the Parking Agreement was executed. The statement in the point that the trial court is inconsistent in permitting Nigro's tenants to restrict parking to its customers can only refer to a sign or signs posted by A & P and the intended and actual effect of the signs. The only evidence on this subject is that at some time A & P had been bothered with the employees of businesses across 75th street daily occupying part of the parking spaces next to its building and that A & P had stopped that intrusion. There is no evidence that either Nigro, Katz or A & P has in any manner prevented or restricted parking by customers of the tenants of Rock Springs.

The judgment is reversed and the cause remanded with directions that the court enter a new judgment consistent with this opinion.

All concur.

### APPENDIX

### "AGREEMENT

THIS AGREEMENT, made and entered into this 13th day of August, 1963, by and between NIGRO CORPORATION, a Missouri corporation, hereinafter referred to as 'NIGRO,' and ROCK SPRINGS REALTY, INC., a Missouri corporation, hereinafter referred to as 'ROCK SPRINGS.'

WITNESSETH:

WHEREAS, the parties herein own and/or control certain land which is adjoining, and

WHEREAS, the parties desire to enter into an agreement which will set forth the uses which will be permitted each party by the other party,

NOW, THEREFORE, IN CONSIDERATION OF ONE DOLLAR ($1.00) and other valuable considerations, including the mutual covenants expressed herein, the receipt of all consideration being acknowledged by each of the parties, IT IS AGREED AS FOLLOWS:

### 1. OWNERSHIP AND CONTROL OF PROPERTY

The property owned and/or controlled by each of the parties is set forth on Schedule 1, attached hereto and made a part hereof.

### 2. USE OF PROPERTY

The parties herein presently have constructed or will in the immediate future construct buildings on the land set forth in the last paragraph for the following named tenants or successors thereto:

The Katz Drug Company,

THE Great Atlantic & Pacific Tea Company,

T. G. & Y. Stores Company, and

The Firestone Tire & Rubber Company

Next to, about and adjacent to the above buildings, the parties have also constructed (or will construct) parking facilities for the use of the tenants of such buildings and their respective customers.

Recognizing it is to each party's advantage that neither party impose parking restrictions on such parking facilities, it is agreed that neither party shall install or maintain any barriers or obstructions to the free movement of vehicular and/or pedestrian traffic or to the clear visibility between or among the various buildings

and the parking areas adjacent thereto. It is also agreed that neither party herein shall place, or cause to be placed, any obstruction to the free flow of traffic (or of visibility) between any of their various buildings or between such buildings (including the adjacent parking areas) and either 75th Street or Wyandotte Street. (There was no paragraph numbered 3 in the original.)

### 4. PARKING OPEN TO TENANTS

It is further agreed that all of the parking areas or facilities owned or controlled by the parties herein shall be open at all times to the free and unobstructed use by the tenants and customers of each party's tenants. At no time, shall any restrictions be placed upon the use of the parking facilities by each party's tenants and/or the customers of such tenants.

### 5. RUNS WITH THE LAND

It is agreed that this agreement shall 'run with the land' and it shall be recorded in the Recorder's Office of Kansas City, Jackson County, Missouri."