Jim **THOMAS** and Laura Thomas, et al, Plaintiffs–Respondents,

v.

Lino **DEPAOLI** and Nola B. Depaoli, Defendants–Appellants.

No. 16035.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 25, 1989.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 15, 1989.

Application to Transfer Denied
Nov. 14, 1989.

William A. Wear, Sr., Wear, Karchmer, Nelms & Banning, Bruce K. Kirby, James

R. Sharp, Schmidt & Kirby, Springfield, for defendants-appellants.

G. Michael Baker, Springfield, for plaintiffs-respondents.

HOLSTEIN, Chief Judge.

Defendants Lino and Nola B. Depaoli and plaintiffs Jim and Laura Thomas and John and Virginia Pratt all own residential property in Woodcliffe Subdivision in Greene County. Defendants appeal an adverse judgment ordering the removal and enjoining maintenance of a six-foot high privacy fence constructed closer than sixty feet to the front of a lot they own. The Depaolis claim the trial court's judgment erroneously failed to give strict construction to language in a restrictive covenant. We affirm.

The original owners and developers of the subdivision were Allen and Genevieve Salts. The plat of Woodcliffe Subdivision filed in 1962 contained restrictive covenants. The pertinent part of the third paragraph of restrictive covenants provides:

No dwelling, including porches or paved terraces or any other building, shall be erected on any residential lot in Woodcliffe closer to the front line of any lot than shown by the set back lines on said Plat.

The set back line shown on the plat is sixty feet from the front of the lots. The only specific mention of fences appears in the twelfth restrictive covenant. It states:

No residence or outbuildings may be erected, placed or altered on any lot until the construction plans, specifications and a plan showing the location of the structure have been approved by Salts as to quality of workmanship and materials, harmony of exterior design with existing structures, and as to location with respect to topography and finish-grade elevations. No fence or wall shall be erected, placed or altered on any lot unless similarly approved. The approval or disapproval, as required in these covenants, shall be in writing. In the event the Salts fails to approve or disapprove within thirty (30) days after the plans and specifications have been submitted to Salts, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required; and the related covenant shall be deemed to have been fully complied with.

The sixteenth paragraph of the restrictive covenants provides in part: "These restrictions may be enforced by any owner or owners of any lots in said subdivision...."

The Depaolis are owners of Lots 3 and 8 in Block "B" of Woodcliffe Subdivision. Their residence is on Lot 3 which fronts on Clayhill Street. Lot 8 is to the rear of Lot 3, however the front of Lot 8 is on Woodcliffe Street. The Depaolis have made improvements on Lot 8, including landscaping and construction of a swimming pool. Lot 8 is, in effect, an extension of their back yard. Plaintiffs' residences are on Woodcliffe Street.

In mid May of 1985, the Depaolis commenced construction of a six-foot high solid wood privacy fence. The fence was to completely enclose the defendants' back yard and would extend to within four to five feet from, and run parallel to, Woodcliffe Street. On May 31, 1985, Mr. Pratt hand-delivered a letter to the defendants' fence builder indicating Pratt's objection to the fence. Mrs. Depaoli responded by contacting Mr. Salts.

Salts testified that he had sold all interest in the subdivision in 1972. He admitted he had never given written permission to anyone to build a fence, although several fences had been erected in the neighborhood. When contacted by Mrs. Depaoli, Salts claims to have told her it was not up to him to approve the fence. However, Mrs. Depaoli said he told her he did not care if she built the fence. There was evidence of other similar fences in the subdivision, but no similar privacy fence had been constructed near or adjacent to a street.

Defendants proceeded with construction and on June 4, 1985, this action was filed. The fence was completed prior to trial. Following a trial to the court, judgment was entered which included unrequested

findings of fact and conclusions of law. The court found that the restrictive covenant regarding "prior approval of a fence ... ha[d] been abandoned by non-use." However, the court found the "tight and high privacy fence ... [to be] in violation of Restrictive Covenant No. 3." The judgment ordered removal and enjoined maintenance of the fence.

■ Plaintiffs argue that we should ignore the findings as they do not afford any basis for review. The claim is based on a rule which has been abandoned. The former rule was that voluntary findings of fact and conclusions of law present no question for review other than as a general finding and may not be assigned as error on appeal. *Conley v. Crown Coach Co.*, 348 Mo. 1243, 159 S.W.2d 281, 285 (1942); *Wills v. Alcorn*, 636 S.W.2d 142, 144 (Mo. App.1982); *Prudential Property & Casualty Ins. Co. v. Cole*, 586 S.W.2d 433, 435 (Mo.App.1979); *Swetnam v. U.S. By-Products Corp.*, 510 S.W.2d 829, 830 (Mo.App. 1974). However, in *Graves v. Stewart*, 642 S.W.2d 649, 651 (Mo. banc 1982), the Supreme Court cited the former rule, then said:

We believe that the better rule is that when no request is made of the court in a court-tried case to make specific findings of fact or conclusions of law and they are voluntarily given, such findings and conclusions do form a proper basis for assigning error and should be reviewed. Any holding to the contrary is hereby overruled.

More recent cases cite the old rule. *Krausch v. Director of Revenue*, 764 S.W.2d 512, 514 (Mo.App.1989); *M___D___ v. C___D___*, 691 S.W.2d 406, 408 (Mo.App.1985). Nevertheless, we are bound by the most recent controlling decision of the Missouri Supreme Court. *Dorman v. Minnich*, 336 S.W.2d 500, 509 (Mo. banc 1960).

■ As with other judgments in court-tried cases, a judgment involving the construction or enforcement of restrictive covenants will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, un-less it erroneously declares the law, or unless it erroneously applies the law. *Dierberg v. Wills*, 700 S.W.2d 461, 465 (Mo. App.1985).

The question presented in defendants' point relied on is whether the trial court erred in determining "the fence constitutes a building within the language of ... Restrictive Covenant No. 3."

A covenant which is clear and unambiguous on its face is not open to judicial construction. *Id.* at 468. The initial question to be determined is whether an ambiguity exists. In its broad meaning, the word "building" refers merely to that which is constructed. *Winston v. Hartford Fire Ins. Co.*, 317 S.W.2d 23, 27 (Mo. App.1958); 12 C.J.S. *Building*, p. 723 (1980). In its narrow sense, "building" means a structure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like which encloses a space within its walls and is usually, but not necessarily, covered with a roof. Black's Law Dictionary 176 (5th ed. 1979); 12 C.J.S. *Building*, p. 724 (1980). We conclude that the use of the word "building" in the restrictive covenant under consideration is ambiguous and requires construction.

An excellent compendium of the rules for construing restrictive covenants was collected by Judge Snyder in *Paddock Forest Residents Ass'n v. LaDue Serv. Corp.*, 613 S.W.2d 474, 477 (Mo.App.1981) (citations omitted):

Restrictive covenants are not favorites of the law and must be strictly construed. Language used in the entire instrument, not just one clause, will be considered. If the restriction is unambiguous it is improper to inquire into the surrounding circumstances for aid in its construction. Principles of construction should not be applied in a way to defeat the plain purpose of the restriction. However, if the meaning of a restriction is in doubt, the court must inquire into the intentions of the parties to the agreement and may inquire into the purpose which the parties sought to accomplish and the circumstances surrounding execution of the

contract. Any reasonable doubt as to meaning will be resolved in favor of the free use of the land.

▮ The thrust of defendants' argument is that the rule requiring strict construction of restrictive covenants takes precedence over all other rules of interpretation. That is not the law.

> Notwithstanding [the rule of strict construction] greater regard is to be given to the clear intention of the parties than to the words used in attempting to express that intention; that the Agreement should be given a reasonable and natural construction, one that the parties would, as reasonable men, be likely to make, rather than a useless contract resulting in no good to either party. The cardinal rule permeating the entire field of construction is, of course, that the court ascertain the intention of the parties and then give effect to that intent, unless it conflicts with some positive rule of law.

*Caniglia v. Nigro Corp.*, 441 S.W.2d 703, 712 (Mo.1969). Determining the "clear intent" of the covenantors necessarily requires an inquiry into the purposes sought to be accomplished by the restrictive covenant. *Berkley v. Conway Partnership*, 708 S.W.2d 225, 227 (Mo.App.1986).

We find no Missouri cases specifically discussing the purpose of a restriction prohibiting erection of a building within a specified "set back" distance. Cases from other states are instructive.

> It appears obvious that the two main objectives sought to be accomplished by the restriction ... prohibiting the erection of any building on the 30 foot space lying between the building set back line and the front lot line, are as follows:
>
> (1) To prevent the obstruction of the view of the owners of adjoining properties; and,
>
> (2) To foster and preserve the attractiveness of the platted area as a desirable residential section by requiring that the homes to be erected therein be set back a uniform distance from the street.

*Perkins v. Young*, 266 Wis. 33, 62 N.W.2d 435, 438 (1954). Worded differently, but of similar effect:

> The purpose of a building line restriction is to create an easement for unobstructed air, light and vision for the benefit of the public and the owners upon whose property the restricted area is laid out. Another purpose is to insure a certain degree of uniformity in the appearance of buildings erected on the property where the line is established.

*Freehling v. Development Management Group*, 75 Ill.App.3d 243, 30 Ill.Dec. 610, 613–14, 393 N.E.2d 646, 649–50 (1979) (citations omitted). Construing a restriction which required that "all buildings shall be placed at least fifteen feet back of the front line of lots," the Supreme Court of Michigan said, "The purpose of the restriction at bar was not to control the kind of buildings but to govern their location in order to afford adjoining owners light, air and view." *Bagiano v. Harrow*, 247 Mich. 481, 226 N.W. 262 (1929).

Also instructive as to the purposes of the restrictive covenants were their effect in the neighborhood. Mr. Thomas testified regarding his observations when he purchased the property:

> [O]ne thing impressed us about the neighborhood in Woodcliffe was the openness of the neighborhood and the trees and that there weren't a lot of fences around like you see in quite a few neighborhoods in Springfield.
>
> It seemed like a park with homes in it, if you will....

Further reinforcing the purpose and intent of the restrictive covenant was the testimony by Mr. Salts that the subdivision was designed to establish a neighborhood of spacious, wooded lots.

On the question of whether a fence erected between the building set back line and the front lot line constitutes a violation of a plat restriction prohibiting the erection of a "building" within such space, 26 C.J.S. *Deeds* § 164(1), p. 1108 (1956), states, "The marked tendency of the courts is to give effect to the intention of the parties, and, in so doing, to extend the meaning of the term to cover structures that ordinarily would not fall within the strict definition of the word."

The majority rule appears to be that the word "building" in a restrictive covenant intended to restrain obstruction of view will include any structure having that effect, including a fence. *Freehling v. Development Management Group*, 30 Ill. Dec. at 614, 393 N.E.2d at 650; *Perkins v. Young*, 62 N.W.2d at 439; *Bagiano v. Harrow*, 226 N.W. at 262; *see also* Annotation, *Restrictive Covenants as Affecting Fences, or Walls or Hedges Similar Thereto*, 23 A.L.R.2d 937 (1952). *Himmel v. Hendler*, 161 Md. 181, 155 A. 316 (1931), followed the majority rule, but reached a result opposite the other cases cited. It held that a three-foot high brick fence did not deprive occupants of neighboring houses of the benefits of air, light and view, and therefore did not constitute a building under the terms of a set back requirement in a restrictive covenant. *Himmel v. Hendler*, 155 A. at 320. The minority view, as expressed by Massachusetts' highest court, is that a wall or fence cannot be held to come within the term "building." *Clark v. Lee*, 185 Mass. 223, 70 N.E. 47 (1904). Because *Caniglia* requires that greater consideration be given to the clear intention of the parties than to the rule requiring a strict construction of restrictive covenants, we follow the majority rule expressed in *Freehling*, *Perkins*, and *Bagiano*.

We conclude that the purposes and clear intent of a building set back line restriction is to promote uniformity of appearance and prevent obstruction of view, light, and air. A fence which defeats the intent and purposes of the set back restriction is a "building," even though a strict construction of the word might lead to an opposite result.

The question remaining is whether defendants' fence has the effect of obstructing the view of the neighbors or violates the uniformity of appearance in the neighborhood. The trial court made no findings on those fact questions. Therefore, they are considered as having been found in accordance with the result reached. Rule 73.-01(a)(2).[1]

We have already noted Mr. Thomas' testimony describing the neighborhood as looking like a park and Mr. Salts' testimony that the subdivision was designed to have large wooded lots. Photographs of the area between the front line and the building set back line of the subdivision depict verdant lawns complimented by shrubs, flowers, and large trees. Within the restricted area, the view is uniformly open and notably free of man-made structures which obscure the view. The exception is Lot 8, where defendants' "tight and high privacy fence" invades the restricted area. Mr. Thomas and Mrs. Pratt both testified that the fence obstructed their view. Thomas was especially concerned that the fence obstructed lateral view of persons entering Woodcliffe Street from lots adjacent to Lot 8, thereby creating a safety hazard. To summarize, there was substantial evidence that the effect of the fence violated the purposes of the covenant restricting the placement of buildings. Accordingly, there was substantial evidence to support the trial court's judgment.

The judgment is affirmed.

CROW, P.J., concurs.

GREENE, J., dissents in separate opinion.

GREENE, Judge, dissenting.

I respectfully dissent.

The portion of the trial court's judgment pertinent to this appeal is contained in paragraph 11 of the trial court's findings where this language appears:

The tight and high privacy fence (approximately six feet high and solid construction) is in violation of Restrictive Covenant No. 3 as to the front set back line or front yard set back. As it is now constructed, the fence constitutes a building within the language of 'no dwelling, including porches or terraces or any other building' as stated in Restrictive Covenant No. 3.

Restrictive covenant No. 3 does not mention fences, but reads, in its applicable part:

---

**1.** Rule references are to Missouri Rules of Court (20th ed. 1989).

No [d]welling, including porches or paved terraces or any other building shall be erected on any residential lot in Woodcliffe [c]loser to the front line of any lot than shown by the set back lines on said Plat.

The only way that the word "fence" could be engrafted into such prohibition is through judicial construction; that wondrous device used by some judges and courts in an attempt to cure almost every social ill known to mankind, without the aid of legislative pronouncement on the subject. I do not share such a philosophy.

The law does not favor restrictive covenants. For that reason, they are strictly construed in favor of free use of the land. *Dierberg v. Wills,* 700 S.W.2d 461, 468 (Mo. App.1985). Restrictive covenants are not to be extended by implication to include anything not clearly expressed in them. *Vinyard v. St. Louis County,* 399 S.W.2d 99, 105 (Mo.1966). If the meaning of a restrictive covenant is clear and unambiguous on its face, it is not open to judicial construction. *Lake Wauwanoka, Inc. v. Spain,* 622 S.W.2d 309, 313 (Mo.App.1981).

To me, the words "dwelling" and "building," which are the key words in restrictive covenant No. 3, are not ambiguous. If they are not, then strained judicial construction, which decrees that the terms "building" and "dwelling" can be interpreted to mean that a fence is one of such structures, is not permitted under Missouri law. Buildings, dwellings, and fences are simple words that are known and commonly understood by every American over the age of six. A dwelling is a building or shelter in which people live. Webster's New Collegiate Dictionary 352 (1980); Black's Law Dictionary 596 (4th ed. rev. 1972). The same two dictionaries define a building as a structure or edifice erected by man and designed for the habitation of man or animals, or for the shelter of property. *Webster's* at 144; *Black's* at 244. As such, it has walls, and usually a roof. On the contrary, a fence is simply a barrier erected by man intended to mark boundaries, or to prevent escape or intrusion. *Webster's* at 418; *Black's* at 745.

No definitions to the contrary appear in the Greene County Zoning and Building Regulations, which are applicable in this case, since Woodcliffe Subdivision is in the unincorporated area of Greene County, Missouri. In its building regulations, Greene County follows The BOCA National Building Code/1987, which defines a building as any structure, used or intended, for supporting or sheltering any use or occupancy. *BOCA* at 23. A fence certainly does not fall within this definition.

Finally, the Greene County Zoning Regulations adopted February 15, 1978, and last amended July 18, 1988, which contains hundreds of references to buildings, defines a building as any structure having a roof supported by column[s] or walls, used or intended to be used for the shelter or enclosure of persons, animals, or property. Article 1, Section 3(9). In the same regulations, a dwelling is defined as any building or portion thereof designed or used exclusively for residential occupancy of one or more persons including one family, two-family, and multi-family dwellings, but not including tents, travel trailers, boarding, rooming houses, tourist courts, hotels or motels. Neither definition mentions fences.

The Building and Zoning Regulations of the City of Springfield define buildings and dwellings in substantially the same manner as does Greene County. General Ordinance No. 3870 of the City of Springfield, effective October 1987, which amended Chapter 36 of the Land Development Code, refers to the prohibition of erecting fences in certain areas where they might hinder visibility of street traffic. Words such as hedge, tree, shrub, flower, and other vegetation or landscaping materials are included in the fence-like objects that are prohibited in certain areas.

There is nothing in either the county or city ordinances or regulations that even remotely suggests that the framers of such laws and regulations had the slightest notion that anyone would ever construe those laws and regulations in such a way as to say a fence was a building, or, conversely, a building was a fence.

The developer (Salts) of Woodcliffe Subdivision was well aware of what a fence was, since he provided in restriction No. 12 as follows:

No residence or outbuildings may be erected, placed or altered on any lot until the construction plans, specifications and a plan showing the location of the structure have been approved by Salts as to quality of workmanship and materials, harmony of exterior design with existing structures and as to location with respect to topography and finish grade elevation. *No fence or wall shall be erected, placed or altered on any lot unless similarly approved.* (Emphasis ours.)

It seems only logical to me that if the developer intended to include fences, walls, hedges, etc., along with dwellings or buildings, as things prohibited in the set back line area in restriction No. 3, he would have said so.

Even if there were doubt as to what the words "building" and "dwelling" in restriction No. 3 mean, which seems highly unlikely to me, such doubt, by law, should be resolved in favor of the free use of the property by its owners. *Caniglia v. Nigro Corporation,* 441 S.W.2d 703, 712 (Mo. 1969). When one considers the possible implications of the trial court's ruling, its faulty rationale is obvious. There are thousands of fences in Greene County located on, or near property lines. If they are transformed by a wave of the judicial wand into buildings, are all of those property owners required to remove them, as violative of county and city set back requirements? Are existing fences enclosing swimming pools, which encroach in set back line areas, to be torn down, exposing small children to danger and property owners to lawsuits?

I believe the trial court in its judgment went far beyond the expressed language of restriction No. 3 in order to reach a result evidently desired by the court. Such judicial tinkering should be avoided at all costs. When judges twist the meaning of words, contrary to their clear and unambiguous meaning, in order to reach the result they wish to reach, the public, which is used to plain, common sense language and the ordinary meaning of words, loses faith in the judicial system. I do not believe that we should contribute to that loss of faith.

I would reverse the judgment of the trial court.