**Michele and Gregory HURST, Appellants,**

v.

**VICTORIA PARK SUBDIVISION ADDITION NO. 1 HOMEOWNERS' ASSOCIATION, Appellee.**

No. S–10249.

Supreme Court of Alaska.

Nov. 29, 2002.

Allan E. Tesche, Russell, Tesche, Wagg, Cooper & Gabbert, Anchorage, for Appellants.

Jesse C. Bell, Brena, Bell & Clarkson, P.C., Anchorage, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

The Victoria Park Subdivision Homeowners' Association built a short wood fence at the edge of Lot 43, a lot set aside for recreational purposes. Gregory and Michele Hurst, who live on an adjacent lot, sued, claiming that the fence violated a restrictive covenant proscribing "permanent structures" on Lot 43. The trial court granted summary judgment to the Association on the grounds that the fence comported with the designated purpose of the restrictive covenant and did not prevent the Hursts from using Lot 43. Because the fence does not violate the restriction against "permanent structures" as that term is used in the restrictive covenant,

and because there is no factual issue to preclude summary judgment, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Gregory and Michele Hurst are the owners of Lot 16 of the Victoria Park Subdivision, located at 7701 Canal Street in the Sand Lake area of Anchorage. Their lot borders Lot 43 of the Victoria Park Subdivision. Victoria Park Subdivision Addition Number 1 Homeowners' Association (the Association) is an Alaska nonprofit corporation organized to govern Lots 32 through 56 of the Victoria Park Subdivision Number 1. Lot 43 was set aside for low-intensity recreational purposes and is subject to a restrictive covenant:

> Lot 43 has been deeded to the non-profit corporation formed as provided in Part E–5, except for the reservations of easements. Lot 43 shall only be used for non-intensive recreational and park purposes such as an informal play/picnic area, limited landing for small, manually transportable boats and limited walkway access, while at all times allowing for maximum protection of natural vegetation. Only pedestrian access shall be allowed. No motorized vehicles or aircraft shall be permitted. No permanent structures except incidental recreational structures such as canoe/boat racks, docks, a gazebo, picnic tables, barbecues, etc., will be allowed. Signs will be permitted to help enforce proper use of Lot 43.

> The non-profit corporation formed pursuant to E–5 shall maintain, preserve, improve and control the interest in such lot for the use and benefit of all owners in the Victoria Park Subdivision, Addition No. 1, Lots 32 through 56, and for the use and benefit of the owners of Lots 1 through 31, Victoria Park Subdivision, provided the owners of Lots 1 through 31, Victoria Park Subdivision, pay a pro rata share of the costs of Lot 43.

The Hursts are not members of the Association, but they do pay a pro rata share of the costs of Lot 43 as provided for in the covenant and are therefore entitled to the use and enjoyment of the lot.

The Association experienced considerable difficulties controlling access to and use of Lot 43. A stolen automobile was abandoned on Lot 43, items such as boats and a wind surf board were disturbed, and "No Trespassing" signs were removed without permission. There were also incidents of trespassing. Previous owners of the Hursts' lot, Lot 16, had treated Lot 43 as their "private domain" by filling in its wetlands with excavation dirt, mowing the grass, and harassing other Association members who were attempting to use Lot 43. One previous owner of Lot 16 installed flower beds extending twenty feet onto Lot 43. The owner of Lot 17, next to the Hursts, had problems with trespassers crossing his lot to gain access to Lot 43, so he erected a three-foot-high, split-rail wood fence on the boundary between Lots 17 and 43. On December 7, 1997, the Association voted to erect a fence around the remaining open side of Lot 43.

The Hursts purchased Lot 16 in November 1997. On September 14, 1998, the Association informed the Hursts that it intended to construct a low, split-rail fence along the border between Lot 43 and Lot 16. The fence was constructed in the same style and material as the existing fence built by the owner of Lot 17, which also borders Lot 43. It is a three-foot-high, split-rail fence made of wood. It is secured by wood posts inserted approximately two feet in the ground.

## B.  Procedural History

On September 24, 1998, the Hursts filed a complaint alleging that the fence violated the terms of the restrictive covenant and asking

for declaratory judgment, damages, injunctive relief, and attorney's fees.[1] The Hursts and the Association both moved for summary judgment. On April 11, 2001, Superior Court Judge Peter A. Michalski concluded that the wood fence did not violate the prohibition against permanent structures, considering the covenant's purpose to set aside land for "non-intensive recreational and park purposes ... while at all times allowing for maximum protection of natural vegetation." Final judgment was entered on June 6, 2001. The Hursts appeal.

## III.  STANDARD OF REVIEW

■ We uphold summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2] The interpretation of a covenant is a question of law to which we apply our independent judgment.[3] Findings of fact will not be disturbed unless they are clearly erroneous.[4]

## IV.  DISCUSSION

### A.  The Fence Is Not Prohibited by the Restrictive Covenant.

■ The issue before us in this case is whether the split-rail wood fence on Lot 43 violates the terms of the restrictive covenant. Both parties have focused on whether other courts have considered fences to be permanent structures in other contexts. Indeed, the Hursts' primary argument is that a fence is a permanent structure, and that it therefore violates the terms of the restrictive covenant.[5] The Hursts cite *Thomas v. Depaoli,*

---

1.  The complaint was later amended to add a second count, but no issue involving that count is before this court.

2.  *Stadnicky v. Southpark Terrace Homeowner's Ass'n,* 939 P.2d 403, 404 (Alaska 1997).

3.  *Kohl v. Legoullon,* 936 P.2d 514, 516 n. 1 (Alaska 1997).

4.  *Id.*

5.  The Association responds by suggesting that a fence is not permanent where its posts are not supported by a cement foundation. *Town of Ogden Dunes v. Wildermuth,* 142 Ind.App. 379, 235 N.E.2d 73, 75 (1968). We find this approach unavailing and decline to employ it.

The Hursts also point out that fences are considered permanent structures in the Anchorage building and zoning codes. Furthermore, they suggest that this court's decision in *Persson–Mokvist v. Anderson* allows reference to state and local regulations and building codes for interpretation of the covenant at issue. 942 P.2d 1154 (Alaska 1997). *Persson–Mokvist* concerned state land that was subdivided into five-acre lots and had a plat note that stated, "[t]his subdivision is for residential/recreational use." *Id.* at 1155. In order to discern the meaning of "residential use" and "recreational use," we looked to definitions of these terms "in state land disposal and planning regulations in existence when the subdivision was created." *Id.* at 1156. However, *Persson–Mokvist* did not involve a restrictive

where a Missouri appellate court concluded that "[t]he majority rule appears to be that the word 'building' in a restrictive covenant intended to restrain obstruction of view will include any structure having that effect, including a fence."[6] The Hursts also rely on *Freedman v. Kittle*, where a New York appellate court determined that a fence violated a property's restrictive covenant that prohibited structures "thereon," reasoning that use of the term "thereon" evinced an intent to have views remain unobstructed.[7] However, both of these cases focused on the intent of the parties drafting the covenants to prevent obstruction of views. In contrast, the covenant at issue in this case was not drafted to preserve views for adjacent lot owners, but to maintain Lot 43 for "non-intensive recreational and park purposes." We are thus guided in our analysis by the specific language and purpose of the covenant restricting Lot 43.

■ Whether a fence falls within the operation of a restrictive covenant prohibiting "permanent structures" depends upon the purpose of the restriction and the nature of the fence.[8] In keeping with this basic principle, the Association suggests two questions that must be answered to determine whether the fence is a structure prohibited by the covenant: what was the purpose of setting aside Lot 43 and does the fence contravene that purpose? The Association maintains that Lot 43 was set aside for non-intensive recreational purposes and was meant to have "limited walkway access" in order to protect the natural vegetation. Since the fence furthers these purposes, the Association asserts,

it is not a "structure" under the terms of the covenant. In general, we agree. A three-foot-high, split-rail wood fence does not interfere with or materially obstruct the intended use of the land for non-intensive recreational purposes. If Lot 43 were completely surrounded by a high, impenetrable fence, it could interfere with the intended use of the land, but Lot 43 is accessible by two common entrances, one of which is right next to the Hursts' property.

■ Interpretation of restrictive covenants is guided by several canons. Where the language of the covenant is not ambiguous, the plain meaning governs.[9] Where the language of the covenant is ambiguous, judicial construction is necessary.[10] Covenants are construed within their own four corners.[11] They are also construed to effectuate the intent of the parties.[12] Once the intentions of the parties to the covenant are known, their intention serves to limit the scope and effect of the restriction.[13] Because restrictions are in derogation of the common law, they should not be extended by implication, and doubts should be resolved in favor of the free use of land.[14]

Several aspects of the covenant are relevant to our inquiry. First, the covenant prohibits permanent structures and allows "incidental recreational structures" by way of a non-exhaustive list. Since a fence is not for recreation, it cannot be included in the list of "incidental recreational structures" without stretching the meaning of that language. However, the covenant also specifically per-

---

covenant, and the court consequently had no point of reference to determine the meaning of the language or the intent of the parties. Persson–Mokvist thus lacks the operative legal instrument central to this case and is therefore of little use.

6. 778 S.W.2d 745, 749 (Mo.App.1989).

7. 262 A.D.2d 909, 693 N.Y.S.2d 651, 653 (1999).

8. 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* §§ 190, 224 (1995).

9. *Gordon v. Brown,* 836 P.2d 354, 357 (Alaska 1992); *Lamoreux v. Langlotz,* 757 P.2d 584, 587 (Alaska 1988); 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 171.

10. 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 171.

11. *See Lamoreux,* 757 P.2d at 587.

12. *Id.;* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* §§ 16, 171.

13. 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 171.

14. *Lamoreux,* 757 P.2d at 587; *see also Kalenka v. Taylor,* 896 P.2d 222, 226 (Alaska 1995); *Lenhoff v. Birch Bay Real Estate, Inc.,* 22 Wash.App. 70, 587 P.2d 1087, 1089 (1978).

mits signs "to help enforce proper use of Lot 43."

While only Part D of the covenant actually restricts Lot 43,[15] other provisions of the covenant shed light on the intended meaning of "permanent structure." For example, Part B-8 provides that "[n]o structure of a temporary character (trailer, basement, tent, shack, garage, barn or other outbuilding) shall be used on any lot at any time as a residence." The Association points out that the examples of structures in this section are all "buildings of a size sufficient to house a resident." Part C-1 of the covenant instructs that "no building, structure, fence or other improvement shall be constructed, placed, erected, re-painted, altered or made without the express approval of the Architectural Control Committee." The Association argues that "[i]n this section, 'structure' does not include a fence because 'fence' is listed separately from 'structure.' " Based upon these uses of the term in other parts of the covenant, the trial court concluded that the covenant drafters intended a narrower use of the term "structure." We agree. When considered in the context of the whole document, the term "structure" does not include a fence.

Moreover, the purpose of the covenant is plain: "Lot 43 shall only be used for non-intensive recreational and park purposes such as an informal play/picnic area, limited landing for small, manually transportable boats and limited walkway access, while at all times allowing for maximum protection of natural vegetation." Thus, the intent of the covenant was to maintain Lot 43 for "non-intensive recreational and park purposes" and the fence is consistent with that purpose. Indeed, "limited walkway access" is entirely consistent with construction of a low fence. The fence may interfere with the Hursts' previously unobstructed view of the lake and the "illusion of space and openness," but the covenant was drafted to protect Lot 43, not the view from Lot 16. Therefore, we conclude that the low, split-rail fence on Lot 43 is not a "permanent structure" within the meaning of this covenant.

The Association also urges this court to consider the duties imposed upon the Association by the covenant to "maintain, preserve, improve and control the interest in such Lot for the use and benefit of all owners" in the Victoria Park Subdivision. The construction of the fence preserves and controls the use of the lot for the benefit of the owners in accordance with that duty. Indeed, it appears that concern for this duty was the reason the Association constructed the fence—the Association was attempting to maintain and preserve the lot in light of difficulties with previous owners of Lot 16, as well as random trespassers. In addition, the Association built the fence to demarcate clearly Lot 43's boundary line as other landowners had attempted adverse possession by extending their gardens and flower beds well onto Lot 43. Thus, the fence comports with the general, affirmative duty that the covenant imposes upon the Association.

**B. The Hursts' Argument that the Fence Prevents Reasonable Access to Lot 43 Will Not Be Considered.**

In their reply brief, the Hursts argue that the fence prevents reasonable access to Lot 43. They assert they must now "find a public easement somewhere else" or "literally climb over the [Association's] fence." This argument was raised for the first time in reply and was not made in the trial court. Therefore it is not properly before us, and we decline to consider it.[16]

---

**15.** The covenant provides that "Lot Forty-three (43) shall be subject only to the provisions of Part D herein." The parties agree that although Lot 43 is only restricted by Part D, the meaning of the terms in Part D should be considered in the context of how those terms are used in other parts of the same document; this accords with the covenant canons of construction. 20 Am. Jur.2d *Covenants, Conditions, and Restrictions* § 171.

**16.** Arguments raised for the first time in a reply brief will not be considered. *Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 632 (Alaska 1995). Moreover, arguments made for the first time on appeal will not be considered. *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 355 (Alaska 2001).

## V. CONCLUSION

We conclude that the fence does not violate the restrictive covenant's prohibition of permanent structures on Lot 43. In addition, the fence properly effectuates the affirmative duty imposed by the covenant on the Association to maintain and protect Lot 43. The decision of the trial court is AFFIRMED.